Jules R. VITERBO, et ux.

v.

The DOW CHEMICAL COMPANY.

Civ. A. No. B–83–555–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Oct. 22, 1986.

Walter Umphrey, Jeff Branick, Provost, Umphrey, Swearingen & Eddins, Port Arthur, Tex., for plaintiffs.

Leonard Rivkin, Rivkin, Leff, Sherman & Radler, New York City, for defendant.

## MEMORANDUM OPINION

COBB, District Judge.

The plaintiff, Jules R. Viterbo, and his wife filed this action on July 6, 1983, seeking monetary relief under the theories of negligence, strict liability, and breach of warranty. The plaintiffs allege in their complaint that the defendant, Dow Chemical Company, manufactured and distributed a herbicide under the trademark label, "Tordon 10K". Plaintiff used this herbicide to attempt to retard the growth of tallow trees on his rural property in Jefferson County, Texas. Plaintiff alleges through his use of Tordon 10K over a five-month period he began to suffer physical and mental ailments, some three months after the plaintiff's exposure to Tordon 10K ceased.

The defendant moved for summary judgment, asserting that the plaintiff has failed to raise any genuine issue of material fact concerning causation, i.e., between the plaintiff's use of Tordon 10K and his alleged injuries. Dow presents two independent arguments, asserting that the plaintiff has failed to raise an issue of fact concerning the necessary element of causation: (1) that there is no epidemiological evidence which shows that Tordon 10K can cause the plaintiff's alleged injuries; (2) that there is no admissible evidence by which the plaintiff can establish causation.

After hearing the parties' arguments, and carefully considering both the law and summary judgment evidence, this court has concluded that the defendant's motion for summary judgment should be granted, and that the plaintiff's complaint be dismissed with prejudice.

## I. THE SUMMARY JUDGMENT EVIDENCE

The plaintiffs have attempted to create a causation issue through the testimony of alleged experts. The plaintiffs' total summary judgment proof in this regard consists of the following:

(1) The two-page affidavit of Albert R. Johnson, an osteopath from Dallas, Texas, who was employed by the plaintiffs' attorney. His affidavit is conclusory, recites no factual results of any tests, findings, results, observations, measurements, or any other detailed scientific data, such as an

epidemiological survey. It does, however, state what the plaintiffs' counsel contended were the magic words, which per se defeat defendant's motion for summary judgment:

It is my professional opinion, based upon reasonable probability and based upon the history obtained from Mr. Viterbo, as well as the physical examination and testing done on Mr. Viterbo, that his exposure to Tordon 10K caused his physical and emotional problems.

The above quotation from Johnson's affidavit made up the plaintiffs' supplemental response to the defendant's motion for summary judgment, which was filed shortly before the hearing on the defendant's motion for summary judgment. Besides the affidavit, the court has been supplied with the deposition of Johnson, and Johnson's hospital discharge summary concerning Viterbo. In the deposition, Johnson was asked a series of questions concerning Viterbo's exposure to Tordon 10K, and the symptoms which Johnson noted:

Q. What symptoms did he have that you relate directly to exposure to Tordon 10K?

A. He related in his history that he had dizziness, headaches, blurred vision, itching and dryness of his skin, insomnia, that he is unable to sleep, psychological changes where he couldn't think, he felt very sluggish, he was getting mentally confused, and he would get very depressed. He also complained of shortness of breath and weight loss of 30 pounds over a two-month period of time.

*    *    *    *    *    *

Q. Could these symptoms have any other source, or in other words, could they be caused by anything else, in your experience?

A. *Those symptoms can be caused by a multitude of different diseases and processes. From his history he gave me, he sought medical attention, and they could not be diagnosed* (sic) *any other reason for those to be present.*

Q. Okay, could you give me a list of all the potential causes that could cause those; that is, those symptoms?

A. Yeah, there's a list. You know, you read.

Q. Is that about all you can think of right offhand?

A. Oh, no, adrenal disease, many types of adrenal disease, hypoadrenal disease can cause it, inner canal abnormalities can cause it, thyroid disease, diabetes.

Q. Okay. Could he be exposed to anything other than Tordon 10K that would have caused these same symptoms?

A. From his history, he had no other exposures to any chemical, or to anything different than he had been doing in his normal routine of living over the previous few years. The only thing that he had done different in that he had been exposed to of a toxic nature from his history was the Tordon 10K, which he said was spread over these months in 1981.

Q. So, basically, you arrived at all this, then, by his history?

A. Yes.

Q. Okay. Thank you for clearing me up. Now, when he went in out there, did you specify the various tests that were to be done on him?

A. Yes.

Q. And what were those tests?

A. There were numerous tests. I don't have the full hospital list of those tests here; they are in the hospital chart.

Q. Were any of those designed to show or prove any relationship of exposure to Tordon?

A. There was only one, and that was designed to.

The testing was conducted at the Northeast Community Hospital located in Dallas, Texas. The tests were an attempt to diag-

nose the cause of Viterbo's symptoms.[1] The principal test consisted of placing Viterbo in a steel and glass airtight booth for approximately thirty minutes on May 4, 1984. For fifteen minutes, the plaintiff was tested first by a placebo, and then, for the remaining fifteen minutes, the chemical Tordon 10K. An open container of an unspecified amount of Tordon 10K was placed in the booth with plaintiff for fifteen minutes, as it was presumed that the plaintiff would either absorb Tordon 10K and the placebo through his skin or nostrils, or in some other manner, but not by eating or drinking a liquid containing it. The plaintiff exhibited no significant changes or symptoms as a result of exposure to the placebo, or more significantly, the Tordon 10K.

(2) The second expert relied upon by the plaintiffs to create a causation issue is the deposition of a psychologist, Raymond Singer, of New York, who actually solicited employment in the case. The plaintiffs attach to their response eight pages of an over 300–page deposition of Dr. Singer. These excerpts supplied by the plaintiff do not relate to causation in any manner, and it is assumed that if any of the remaining excerpts did relate to causation they would have been supplied. However, it is pointed out in their response that "Dr. Singer's testimony in relation to causation is that it is possible that the substances referred to by defendant to some extent played a part in Mr. Viterbo's injuries."

The plaintiff has also been seen by at least four other doctors who were unable or unwilling to express a medical opinion that there was a causal connection between Viterbo's exposure to Tordon 10K, and the symptoms for which they treated Viterbo. This concludes all the summary judgment offered by the plaintiff.

## II. THE SUMMARY JUDGMENT STANDARD

Rule 56(c), FED.R.CIV.P., provides that Summary judgment shall be rendered forthwith if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law.

In *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986) at 1195, the court noted:

The crucial question for the court to consider is whether there is a genuine issue of fact concerning any essential element of the plaintiff's claim. If the moving party can show there is no evidence whatsoever to establish one or more of the essential elements of a claim on which the opposing party has the burden of proof, trial would be a "bootless" exercise ...

Summary judgment will not lie if the dispute about a material fact is genuine; that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Jack Anderson, et al v. Liberty Lobby, Inc. and Willis A. Carto*, — U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Unless there exists sufficient evidence favoring the non-moving party for a jury to return a verdict for that party, there exists no issue for trial. Where the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson, supra*, citing *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

If the defendant in a run-of-the-mill civil case moves for summary judgment, or for directed verdict based on a lack of proof of material fact, the judge must ask himself not whether he thinks evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient. There must be evidence upon which the jury could reasonably find for the plaintiff.

---

**1.** Dr. Johnson's test results are attached as an appendix to this memorandum.

*Anderson, supra* — U.S. at ——, 106 S.Ct. at 2512. Thus, the summary judgment standard is the mirror of the standard for a directed verdict.

> The primary difference between the two motions is of a procedural nature. Summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.... In essence, though, the inquiry under each is the same—whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson, supra,* at —— – ——, 106 S.Ct. at 2512.

The movant need not even disprove the opponent's position. In *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) the Court held there was no express or implied requirement in Rule 56 that requires the moving party support its motion with affidavits or other similar materials negating the opponent's claim. The Court stated that a motion for summary may and should be granted, so long as whatever is before the district court demonstrates that the standard for entry of summary judgment as set forth in Rule 56(c) is satisfied.

## III. THE ANALYSIS

### THE OFFERED EXPERT TESTIMONY IS INADMISSIBLE UNDER FEDERAL RULES OF EVIDENCE § 703

■ It is clear that the Federal Rules of Evidence apply to summary judgment motions. *See,* FED.R.CIV.P. 56(e), requiring the contents of the affidavits to be admissible in evidence, and *Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982).

■ In determining whether an expert's opinion is sufficient to withstand a summary judgment motion, courts must undertake a detailed inquiry into the admissibility of the proffered testimony. *In Re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223 (D.C.N.Y.1985).

Conceding that Singer and Johnson are determined to be correctly labeled experts, this court need not determine if they meet the standards set forth in Rule 702 of the Federal Rules of Evidence. However, this court must determine whether the data relied upon by Singer and Johnson is of a type reasonably relied upon by experts in the particular field in forming opinions, or inferences upon a subject. A rigorous examination is especially important in the toxic tort context, where presentation to the trier of theories of causation depends almost entirely upon expert testimony. This examination is required because courts have afforded experts wide latitude in picking and choosing the sources on which to base opinions. Rule 703 nonetheless requires courts to examine the reliability of those sources. *Soden v. Freightliner Corp.,* 714 F.2d 498 (5th Cir.1983).

■ If the underlying data is so lacking in probative force and reliability that no reasonable expert could base an opinion on that data, then an opinion which rests entirely upon that data must be excluded. *In Re Agent Orange, supra* at p. 1245. A trial court's inquiry into whether the standard is satisfied must be made on a case-by-case basis, and should focus on the reliability of the opinion and its foundation, rather than merely on the fact that it was based, technically speaking, upon hearsay.

### i. *The Data Relied Upon by Johnson in Forming His Opinion*

■ This court finds that the data upon which Johnson relied in forming an opinion as to causation is so unreliable and lacking in probative force that no reasonable expert could base an opinion upon them. Dr. Johnson initially diagnosed Viterbo as suffering from toxic exposure to Tordon 10K, relying only on the patient's oral history, without having tested Viterbo. Thus, a preconceived theory had already been de-

veloped. As the Eleventh Circuit has noted in *Perry v. United States*, 755 F.2d 888 (11th Cir.1985), a scientist who forms an opinion before beginning his research lacks the objectivity needed to produce reliable scientific results.

Dr. Johnson has had no experience dealing with persons exposed to Tordon 10K, nor could he find any scientific literature to support his conclusion. The only support for his contention was a single article, which states that Picoram has been found to be lethal to rats when administered in high doses. There is no literature before the court that Tordon 10K has any effect on humans, regardless of the dosage level. Likewise, there is no medical literature that rats or humans exposed to Tordon 10K suffer any of the symptoms which Viterbo exhibited.

The tests which Dr. Johnson performed on Viterbo in fact failed to establish a causal link between exposure to Tordon 10K and the symptoms complained of by the plaintiff. What the tests did show was that Viterbo had high levels of Dieldrin DDE, Heptachlore Epoxide, and Beta BHC, which could account for the symptoms and injuries complained of by the plaintiff.

It is also true that none of the other doctors, except Dr. Singer, would diagnose Viterbo's condition as being caused by Tordon 10K, though there were several diagnoses which individually or collectively accounted for Viterbo's symptoms without implicating Tordon 10K as a cause. Of the four treating physicians plaintiff saw, Dr. James Halbert diagnosed endogenous depression; Dr. George Graham diagnosed depressive neurosis; Dr. John Forsythe diagnosed essential hypertension, radiculitis, and osteoarthritis. Dr. Edward Heartfield diagnosed allergies.

When seen as a whole, Dr. Johnson's opinion is not based upon a reliable and trustworthy foundation. The doctor's experience, examinations and tests, the scientific literature, or Viterbo's possible self-serving history do not serve to warrant a reasonable expert in forming the opinion that Dr. Johnson formed. In fact, the tests performed by Dr. Johnson on Viterbo, wherein Viterbo was exposed to Tordon 10K, proved negative for the symptoms that Viterbo complains of in this lawsuit.

Thus, this court holds that the data relied upon by Dr. Johnson is not sufficiently reliable, and lacks probative force, and therefore must be held inadmissible.

ii. *The Data Relied Upon by Dr. Singer in Forming His Opinion as to Causation.*

■ Singer purportedly relied on scientific literature, Viterbo's history and medical records, and his own personal experience. Singer found no scientific publications regarding Tordon 10K, or Picloram Neurotoxicity in humans. He stated he relied on research by a person whose qualifications as an expert are unclear, and nowhere is the exact subject matter and conclusions of the research stated. As to the tests performed on Viterbo by Singer, there is no indication as to what tests Singer performed, or the relevancy of these tests to determine that Tordon 10K was a legal cause of Viterbo's injuries. There is also no evidence that Singer has any competence or qualifications for such a diagnosis, as Singer is a psychologist, and not a physician; he has received no specialized training in toxology, epidemiology, or any other field of medicine. He has never examined anyone who has suffered from toxic exposure. Singer also stated that he never took an extensive pre-exposure history necessary to discount emotional difficulties arising from a non-organic, or non-toxic source.

■ Most important, Singer sought employment from the plaintiff's attorneys in this case; thus, he, like Johnson, did not view Viterbo's condition objectively. As stated in *Johnston v. United States*, 597 F.Supp. 374 (1984), where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and mis-

leading. *See also*, Rule 403, Federal Rules of Evidence.

■ This court further finds the offered expert testimony of either expert to be so lacking in probative weight or value that the court must exclude such testimony under Federal Rule of Evidence § 403. There is a great possibility of misleading the jury through the creation of a false aura of scientific infallibility through the use of such testimony. The court is also of the opinion that even if such testimony was found to be admissible, a reasonable jury could not return a verdict for the plaintiff in this case.

## IV. CONCLUSION

It is, therefore, ORDERED, ADJUDGED and DECREED that the defendant's motion for summary judgment be granted, and the plaintiff's complaint be DISMISSED with prejudice.

## APPENDIX

Other tests administered by Dr. Johnson were performed with the following results:
4-27-84—Chest X-Ray—"No significant abnormalities";
4-27-84—ECG—Normal;
4-28-84—ECC—Normal;
4-27-84—Liver X-ray—Normal;
Spleen—normal, no focal defects;
5-1-84—Chest X-ray—Normal;
5-1-84—CT Brain Scan—Normal.

Abnormal test results yielded elevated sedimentation rate, eleveated triglycerides, [decreased] creatinine clearance, elevated BUN, elevated total cholesterol, elevated IgE (176). Electrophoresis on 4-27-84 yielded elevated beta and elevated gamma with a depressed AG ratio.

HOSPITAL COURSE: The patient was placed in an environmentally controlled room constructed of porcelain. The patient was not placed nothing by mouth with only spring water. However, the patient states that during his time in the unit he became mentally and physically less sluggish. Neutralizing salts are acceptable to this patient—sodium bicarbonate, potassium bi-carbonate and calcium carbonate are all acceptable to this patient.

This patient did not orally challenge less chemically contaminated foods.

Immunotherapy—The patient interdermally challenged 6 molds, dust, dust mite, weed mix, tree mix, grass mix, histamine and Serotonin, and 8 chemicals.

Sensitivity was shown to 6 molds, dust, dust mite, weed mix, tree mix, grass mix, histamine, Serotonin and 2 chemicals, formaldehyde and newsprint.

The patient showed a whealing response $\times$ 3 to formaldehyde and a whealing response $\times$ 2 to newsprint. Altenaria showed a whealing response $\times$ 4 and Hormodendrum mold a whealing response $\times$ 3. Cephalosporum produced a wheal $\times$ 3. MMA produced a wheal response $\times$ 4. MMB produced a whealing response $\times$ 6 and MMC showed a whealing response $\times$ 5. Dust and dust mites also produced whealing response. Dust showed a whealing response $\times$ 3 and dust mites a whealing response $\times$ 5. Weed mix showed a whealing response $\times$ 5. Tree mix likewise. Grass mix produced a whealing response $\times$ 4. Histamine showed a whealing response $\times$ 6 and Serotonin produced a wheal $\times$ 3.

The patient took no immunotherapy in accordance with his primary reason for hospitalization.

Symptom free as determined through interdermal testing:

Chemicals: cigarette smoke, orris root, ethanol, perfume phenol, chlorine.

This patient undertook chemical challenges in a steel and glass airtight booth. The patient was placed on a cardiac monitor with a nurse in attendance and a doctor inhouse.

On 5-4-84 at 8:15 the patient challenged the empty booth. In room pulse 68. In booth pulse 78 beats per minute. A base strip was taken on the cardiac monitor. No symptoms were noted.

The patent then tested a placebo at 8:20 for an additional 15 minutes. The 5 minute

pulse was 88. Again no symptoms were noted.

Ten minute pulse 88, again no symptoms noted.

Fifteen minute pulse equals 72 beats per minute, no symptoms noted by the patient.

The patient continued stable and without symptoms throughout the test and in room after the test.

On 5–4–84 the patient tested the chemical Tordon 10–K at 9:15 to 9:30 a.m.

Room pulse 72 beats per minute.

Booth pulse 88 beats per minute.

Five minute pulse 72 beats per minute with no symptoms noted.

Ten minute pulse 84, no symptoms noted.

Fifteen minute pulse 184 beats per minute, *no symptoms noted at this time.* The patient was returned to his room and again *no symptoms were noted upon completion of this test* and subsequent to the patient returning to his room.

Discharge recommendations due to severe sensitivities with acute reactions—Immunotherapy: The patient took no immunotherapy.

Nutritional recommendations: The patient is on a 4 day monorotation of 3 meals a day plus a snack. After 2 weeks he is to go to a liberalized rotation of 2–3 foods a meal. The patient was instructed to not repeat the food families within a 2 day period.

The Nutrition Department has recommended the following supplementation for this patient: Tru Vita Complete Vitamin Mineral, Vita Line calcium magnesium aspartate, Allergy Research Antioxident, Tru Vita Vitamin C Sego Palm.

Environmental recommendations: The patient has gas heat and he does not feel he is sensitive to this. He has a cat to which he is nonsensitive. He is nonsensitive to chlorine. The patient does have carpet and lots of plants in his home, some of which are in the bedroom, and has been noted, the patient is extremely mold sensitive.

Follow-up: The patient will be followed by the physician by phone. Any late arriving lab which necessitates changes in medical treatment will be initiated at the time of the follow-up consult. The results of the fat biopsy are awaited.

Prognosis at the time of discharge—fair to good.