**SYNTEX PHARMACEUTICALS INTERNATIONAL, LTD.,**
Plaintiff,

v.

**K–LINE PHARMACEUTICALS, LTD. and Drug Guild Distributors, Inc.,**
Defendants.

**T.J. ROACO, LTD., Plaintiff,**

v.

**SYNTEX PHARMACEUTICALS INTERNATIONAL, LTD.,**

v.

**Laura BLACKMAN and Fred Klap, Additional Counterclaim Defendants.**

Civ. A. Nos. 85–2814, 85–2949.

United States District Court,
D. New Jersey.

Sept. 19, 1989.

As Amended Oct. 19, 1989.

---

Richard D. Catenacci, Liza M. Walsh, Connell, Foley & Geiser, Roseland, N.J., James W. Gould, Michael N. Berg, Stephen R. Smith, Karen L. Staff, Morgan & Finnegan, New York City, for Syntex Pharmaceuticals Intern., Ltd.

Charles C. Abut, Lowen & Abut, Fort Lee, N.J., Gerard F. Diebner, James M. Rhodes, Jr., Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for K–Line Pharmaceuticals, Ltd.

Thomas J. Spies, Walder, Sondak, Berkeley & Brogan, Roseland, N.J., Peter T. Cobrin, Cobrin & Godsberg, New York City, for T.J. Roaco, Ltd.

## OPINION

WOLIN, District Judge.

This case demonstrates the danger of a legitimate attempt to design around a patent. If one misreads the patent, one may very well end up squarely within the claims of the patent that one has carefully sought to avoid. Because the Court finds no material issue of fact and finds that the accused product literally infringes the patent-in-suit, the Court will grant the patent holder's motion for summary judgment of infringement. As an initial matter, the Court will also deny a motion by two of the proponents of the accused product for summary judgment based on patent invalidity.[1]

### FACTS AND ALLEGATIONS

Syntex Pharmaceuticals International, Ltd. ("Syntex"), a Bermuda corporation with its principal place of business in Hamilton, Bermuda, is the assignee of U.S. Patent No. 3,592,930 ("the '930 patent"), which issued on July 13, 1971 and expired on July 13, 1988. The '930 patent claims a novel fatty alcohol/glycol solvent (FAPG)[2] composition for topical (*i.e.*, to the skin) application of medicaments such as anti-inflammatory corticosteroids. The main purpose of the invention is therapeutic, that is, to preserve the activity of the medicament and to effectively release it into the skin. Under claim 8 of the patent, Syntex has successfully marketed a product called Lidex 0.05% fluocinonide FAPG cream, whose active ingredient is the steroid fluocinonide. Lidex is prescribed by physicians for the

---

1. The Court heard argument on these motions twice. Much of the initial session—on May 23, 1988—was taken up by a plethora of sanctions motions. After denying all the sanctions motions by opinion of October 14, 1988 and by order filed November 21, 1988, the Court set the substantive motions down for reargument. At the second session—on December 8, 1988—the parties agreed that all the relevant evidence was before the Court and that, with the possible exception of some issues on which there may have been conflicting evidence, the matter was ripe for summary adjudication. *See* Transcript of Oral Argument, Dec. 8, 1988, at 63–67. To aid the Court in its decision, the parties agreed to submit Proposed Findings of Fact and Conclusions of Law, which the Court received by February 10, 1989.

2. The second half of the acronym derives from the fact that the most commonly used glycol solvent is propylene glycol.

topical treatment of skin disorders such as psoriasis and other dermatoses. The fluocinonide FAPG cream developed under the '930 patent has proved to be a scientific and medical breakthrough. It has provided a medical product that is so effective and well tolerated by patients that patients often experience striking improvement within a few days of the start of therapy. Moreover, it has for the first time enabled many psoriasis patients to be effectively treated without occlusive bandages and wrappings.

K–Line Pharmaceuticals, Ltd. ("K–Line"), a Canadian corporation with its principal place of business in Downsview, Ontario, manufactures a fluocinonide product under the mark Vasoderm. Vasoderm is sold in the United States by T.J. Roaco, Ltd. ("Roaco"), a New York corporation with its principal place of business in Toronto, Ontario, and distributed in New Jersey by Drug Guild Distributors, Inc., a New Jersey corporation that does business out of Secaucus.

Alleging that Vasoderm falls within the claims of the '930 patent, Syntex filed suit against K–Line and Drug Guild, who deny infringement and who challenge the validity of the patent by way of affirmative defense and a summary judgment motion. Roaco brought a separate action against Syntex for a declaratory judgment of noninfringement. The two actions have been consolidated. K–Line, Roaco and Drug Guild have now moved for summary judgment of noninfringement. Syntex has opposed that motion and has cross-moved for summary judgment of infringement.

The only claim of the '930 patent asserted by Syntex is claim 8, which is indirectly dependent on claim 1.[3] After accounting for the limitations added by the intermediately dependent claims (*i.e.*, claims 6 and 7), claim 8 of the patent recites a "substantially anhydrous" composition having an effective amount of fluocinonide medicament and a vehicle "consisting essentially of":

(a) 15 to 45% fatty alcohol ("FA");

(b) 45 to 85% glycol solvent ("PG");[4]

(c) 0 to 15% compatible plasticizer;

(d) 0 to 15% compatible coupling agent; and

(e) 0 to 20% penetrant.

The patent specification states that "[t]he fatty alcohol and glycol solvent ingredients are the principle components and are satisfactory as the sole vehicle components in the composition of this invention." '930 patent, col. 2, lines 54–56.

K–Line, Roaco and Drug Guild concede that the accused Vasoderm product[5] contains the fluocinonide called for in claim 8 and meets (a) and (b) of the vehicle requirements. Elements (d) and (e) are not present in Vasoderm and therefore fall literally within the recited 0–15% and 0–20% claim ranges, respectively. The only issue with regard to literal infringement, then, is whether Vasoderm meets requirement (c) above, that is, whether the vehicle[6] con-

---

**3.** Claim 1, the only independent claim of the patent, recites:

A substantially anhydrous composition consisting essentially of an effective amount of a topical medicament and a vehicle consisting essentially of
(a) from 15 to 45 parts by weight saturated fatty alcohol having from 16 to 24 carbons,
(b) from 45 to 85 parts by weight of glycol solvent,
(c) from 0 to 15 parts by weight of compatible plasticizer,
(d) from 0 to 15 parts by weight of compatible coupling agent, and
(e) from 0 to 20 parts by weight of penetrant, the composition being substantially free from petrolatum, mineral oil, monohydric fatty alcohols and fatty acids which are unsaturated and monohydric alcohols, fatty acids

and fatty amides which have less than 16 carbons.

**4.** *See supra* note 2.

**5.** The undisputed ingredients of Vasoderm are as follows:

| Ingredients | % by Weight |
|---|---|
| 1. Fluocinonide, USP (5% excess) | 0.0525 |
| 2. Stearyl Alcohol, N.F. | 16.5 |
| 3. Polyethylene Glycol–6000, N.F. | 9.0 |
| 4. Propylene Glycol, USP | 52.94125 |
| 5. 1,2,6, Hexanetriol, K–Line | 0.5 |
| 6. Glycerin USP | 21.0 |
| 7. Citric Acid (Anhydrous) USP | 0.00625 |
| TOTAL: | 100.0 |

**6.** Because of the presence of the fluocinonide, the percentage composition of the *vehicle* that any component makes up is not exactly the

tains 0 to 15% by weight compatible plasticizer. K–Line and Roaco admit that Vasoderm contains about 9% PEG 800–20,000, 21% glycerin and 0.5% 1,2,6 hexanetriol. These three ingredients, collectively, make up about 30% of the Vasoderm product. K–Line *et al.* contend that all three are compatible plasticizers[7] and that the concentration of compatible plasticizer in Vasoderm thus exceeds by a factor of two the upper allowable limit of 15%. The '930 patent specifications, K–Line *et al.* note, caution against exceeding the 15% upper limit called for in the claims: "The plasticizer concentration can be within the range of from 0 to 15 percent. Concentrations above 15 percent may provide a composition which has a consistency unsuitable for normal applications or cause instability of the vehicle mixture and some separation of the components." '930 patent, col. 3, lines 9–13. In "Table A" the specifications list an "[o]perable" range of 0 to 15 and a "[p]referred" range of 2 to 10 percent by weight of compatible plasticizer. *Id.* col. 2, lines 8–18. The specifications state that "[i]t is also intended that the chemical compounds in each class of ingredients discussed hereinafter be limited to pharmaceutically acceptable compounds *in the concentrations indicated." Id.* col. 2, lines 21–25 (emphasis added). K–Line, Roaco and Drug Guild admit that the inventor of Vasoderm, Subhan Lakhani, specifically designed around the '930 patent by attempting to substantially exceed the upper limit on compatible plasticizer concentration claimed by the patent. Since Lakhani has successfully done so, they contend, Vasoderm does not literally infringe the '930 patent as a matter of law.

Syntex argues that the Vasoderm vehicle does indeed contain no more than 15% by weight compatible plasticizer. While conceding that the PEG 800–20,000 and the 1,2,6 hexanetriol in Vasoderm, which together comprise approximately 9.5% by weight of the vehicle, function as compatible plasticizers,[8] Syntex argues that only a small portion of the 21%-by-weight glycerin in Vasoderm actually functions as a compatible plasticizer. The remaining portion of the glycerin, according to Syntex, functions in some other way: as a humectant or a solvent. Thus Syntex contends that Vasoderm literally infringes the '930 patent.

In rebuttal, K–Line *et al.* argue that all of the glycerin in Vasoderm functions as a compatible plasticizer. In addition, they point out that the only suggested use of glycerin (or glycerol, as it is also called) in the patent is as a compatible plasticizer. *See* '930 patent, col. 2, lines 66–69; *id.* claim 4.

## DISCUSSION

On a motion for summary judgment, the moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In evaluating the merits of a summary judgment motion, the Court must view all the evidence before it in the light most favorable to the nonmovant and must draw all reasonable inferences from that evidence in favor of the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The Court of Appeals for the Federal Circuit has confirmed the use of summary judgment in patent cases. *See, e.g., Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1986); *Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 257

---

same as the percentage of the *overall product* that it makes up. Considering the relatively insignificant amount of fluocinonide (0.0525% of the product), however, the two percentages are approximately the same, and the Court will use them interchangeably.

**7.** K–Line *et al.* take this position despite an opinion by one of K–Line's own experts that the

PEG 800–20,000 in Vasoderm does not function as a compatible plasticizer. *See* Reynolds Dep. at 67. Syntex contends that the PEG does function as such. Since Syntex's position is against its own interest, the Court will assume that the PEG—as well as the 1,2,6 hexanetriol—functions as a compatible plasticizer in Vasoderm.

**8.** *See supra* note 7.

(Fed.Cir.1985); *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed.Cir.1984).

## I. *Validity of the '930 Patent*

■ K–Line and Drug Guild have filed motions for summary judgment on the ground that the '930 patent is allegedly invalid for obviousness under 35 U.S.C. § 103.[9] That section provides in part that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." There are four factual inquiries relevant to the question of obviousness: (1) the level of skill in the art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claimed subject matter as a whole, and (4) objective indicia of nonobviousness, such as commercial success, long felt but unsolved needs, the failure of others to meet those needs, etc. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). In determining obviousness, one must consider the invention as a whole; small differences between the claims and the prior art can therefore give rise to patentability. *See, e.g., Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed.Cir.1984). A combination of prior art features will only be deemed obvious if the prior art references contain a suggestion for so combining their teachings; the hindsight afforded by the invention cannot be used to negate its insight. *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988); *Panduit*, 810 F.2d at 1568; *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed.Cir.1984). In other words, one

must "forget what he or she has been taught ... about the claimed invention and cast the mind back to the time the invention was made ... to occupy the mind of one skilled in the art who is presented only with the [prior art] references." *W.L. Gore & Associates v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

■ The '930 patent, having been issued by the Patent and Trademark Office, enjoys a statutory presumption of validity under 35 U.S.C. § 282, which may be overcome only by clear and convincing evidence of the obviousness of the claimed subject matter. *Hughes Tool Co. v. Dresser Industries, Inc.*, 816 F.2d 1549, 1555 (Fed. Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir.1984). The introduction of prior art more pertinent than that considered by the Examiner, however, weakens the presumption of validity and eases the burden of proof on the party seeking to have the patent declared invalid. *Kimberly–Clark v. Johnson & Johnson*, 745 F.2d 1437, 1443 (Fed.Cir.1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir. 1983); *see also EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 905 (Fed. Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). On the other hand, where the additional prior art cited by the party attacking the validity of the patent is no more pertinent than that considered by the Examiner, the presumption of validity may only be overcome by showing that the Examiner erred in allowing the claims. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

---

**9.** Roaco did not raise patent invalidity as an affirmative defense in its answer and thus has not moved for summary judgment based on invalidity. Several years into this litigation Roaco did request permission to amend its answer to include such an affirmative defense, so that it could then join in K–Line and Drug

Guild's motion. *See* Transcript of Oral Argument, May 23, 1988, at 86. Considering the late date, the Court declined to allow such an amendment except upon consent of counsel for Syntex, who refused. *Id.* at 86–87; *see* Fed.R. Civ.P. 15(a).

■ In support of their invalidity motion, K–Line and Drug Guild proffer several references that they allege were not before the Examiner. Specifically, they have uncovered the 1949 and 1955 editions of Pharmaceutical Compounding and Dispensing, which purportedly establish that cream bases of the type disclosed and claimed in the '930 patent were known in the art as early as 1949. The "formula III" compositions revealed in these treatises contain a fatty alcohol element and a glycol solvent element, although K–Line and Drug Guild concede that the relative proportions differ from those disclosed in the '930 patent. *See* K–Line Initial Brief in Support of Invalidity Motion Exh. D, at 100; *id.* Exh. E, at 253. K–Line and Drug Guild also proffer a Union Carbide publication pertaining to its Carbowax-brand ointments; this publication reveals an anhydrous formulation known as "base II," which consists of a glycol solvent, Carbowax 4000 and a small amount of fatty alcohol. *See id.* Exh. F, at 14. K–Line and Drug Guild cite language from the Union Carbide publication indicating that Carbowax formulations may be varied and that ointments based on polyethylene glycols "have been used successfully as vehicles for almost all types of therapeutic agents," including steroids such as cortisone, hydrocortisone and prednisolone. *Id.* at 12, 13. These publications, according to K–Line and Drug Guild, anticipate the '930 patent, rendering it invalid for obviousness. As additional support for their argument, K–Line and Drug Guild cite the deposition testimony of Dr. Martin Katz, the surviving co-author of the patent, in which Dr. Katz allegedly concedes that some of the above formulations are within the broad concept of his invention.

Syntex first argues that the additional references cited by K–Line and Drug Guild were indeed before the Examiner. Although the patent does not cite Carbowax under the listing of "References Cited," the patent does specifically refer to the Carbowax ointments of the prior art:

A non-aqueous ointment of more recent origin is Carbowax, a grease-like mixture of polyethylene glycols (molecular weight of 1000 to 20,000). This vehicle, although water-washable, has a greasy texture and does not provide an occlusive coating on a treated surface.

'930 patent, col. 1, lines 42–47. Moreover, the patent, on its face, incorporates by reference Remington's Practice of Pharmacy (12th ed. 1961), which provides an extensive discussion of Carbowax ointments and expressly sets forth a formulation identical to the base II Carbide reference cited by K–Line and Drug Guild. '930 patent, col. 4, lines 58–61; *see* Katz Aff. ¶ 40 & Exh. R.[10]

The Court agrees with Syntex that the prior art cited by K–Line and Drug Guild was in fact before the Examiner. K–Line and Drug Guild have not, therefore, weakened the presumption of validity and hence have not eased their difficult burden of proof. *Cf. Kimberly–Clark, supra; Stratoflex, supra.*

■ Turning to the merits, Syntex has submitted the affidavit of Dr. Katz, in which he describes the novelty and uniqueness of his invention and differentiates it from the prior art. Specifically, he notes that the prior art references (1) were not creams, (2) did not provide an occlusive film, and (3) were known to be inappropriate bases for steroids, particularly the newer, more potent steroids such as fluocinonide. Katz Aff. ¶¶ 10–22. Dr. Katz also cites medical literature that describes his invention as a "dramatic result" and a "definite advance in topical steroid therapy." *Id.* ¶ 22. At the same time, Dr. Katz explains how the Pharmaceutical Compounding "formula III" and the Union Carbide "base II" compositions are markedly different from the FAPG composition taught by the '930 patent in that they contain a much smaller amount of fatty alcohol, which "performs only the trivial function of providing slip to an already semi-solid unctuous mass." *Id.* ¶ 23. He concludes

10. Section 608.01(p)(B) of the Manual of Patent Examining Procedure (5th ed. 1983 rev. 1985) provides that non-patent publications may be incorporated by reference in the specification of a patent application "for purposes of indicating the background of the invention or illustrating the state of the art." Berg.Aff.Exh. 4.

that, rather than suggest the '930 composition, the prior art references "lead sharply in the other direction." *Id.* ¶ 27.

K–Line and Drug Guild have not come forth with any affidavits of someone skilled in the art to contradict the exhaustive analysis set out by Dr. Katz; they rely only on their counsel's interpretations of the prior art and on an attempt to take Dr. Katz's deposition testimony out of context and dress it up as an admission by him that the '930 patent is obvious over the Carbowax prior art. The Court does not need to weigh evidence to conclude that, on this record, the evidence is so one-sided in favor of Syntex that K–Line and Drug Guild could not possibly convince a factfinder by clear and convincing evidence that the '930 patent is obvious over the prior art. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Hence there are no material issues of fact as to the validity of the '930 patent.

Accordingly, the Court will deny K–Line and Drug Guild's motion for summary judgment of patent invalidity. The patent is valid as a matter of law.

## II. *Infringement*

 The Court now turns to the cross-motions for summary judgment of infringement or noninfringement, which involve Syntex and all three of its principal opponents. The issue of patent infringement may be resolved in two steps: (1) interpretation of the claims of the patent and (2) comparison of the claims with the accused device. *SmithKline Diagnostics v. Helena Laboratories Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988); *Snellman v. Ricoh Co.,* 862 F.2d 283, 286 (Fed.Cir.1988), *cert. denied,* ── U.S. ──, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989); *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1054 (Fed. Cir.), *cert. denied,* ── U.S. ──, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Although claim interpretation is a question of law, *Snellman,* 862 F.2d at 287, a dispute as to the meaning of terms in a claim is a question of fact, *Perini America, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581, 584 (Fed.Cir.1987). The *Perini* court held:

Like all legal conclusions, that conclusion [claim interpretation] rises out of and rests on a foundation built of established (undisputed or correctly found) facts. Interpretation of a claim, or of its scope, should not be assayed until that foundation is in place. If the meaning of terms in the claim, the specification, other claims, or prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin.

*Id.; see also Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657 (Fed.Cir.1986) (reversing summary judgment of noninfringement). Indeed, the Court must always refer to certain extrinsic evidence—the patent specification, prosecution history and other claims—to interpret a disputed claim. *Moeller,* 794 F.2d at 656; *accord SmithKline,* 859 F.2d at 882. Also helpful is expert testimony, including evidence of how one skilled in the art would interpret the claim. *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988); *see also United States v. Telectronics, Inc.,* 857 F.2d 778, 781 (Fed.Cir.1988), *cert. denied,* ── U.S. ──, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989). On the other hand, an inventor is not bound by the ordinary meaning of terms but is free to be his or her own lexicographer. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed. Cir.1988). "The ordinary meaning of claim language ... is not dispositive and resort must still be had to the specification and prosecution history to determine if the inventor used the disputed terms differently than their ordinary accustomed meaning." *Id.*

 Patent infringement may be found in either of two ways: literal infringement or infringement under the doctrine of equivalents. Literal infringement occurs when every limitation of the patent is found in the accused device literally. *SmithKline,* 859 F.2d at 889. In the absence of literal infringement, a product nevertheless infringes under the doctrine of equivalents if it performs substantially

the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

In ruling on the present cross-motions for summary judgment of infringement or noninfringement, the sole question that the Court must decide with respect to the allegation of literal infringement is whether Vasoderm contains 0–15% by weight compatible plasticizer.[11]

The analysis of this issue must begin with the '930 patent itself since a patentee is entitled to be his or her own lexicographer. *ZMI, supra.* The patent specifications contain the following description of the function of the plasticizer:

> The plasticizer maintains homogeneity in the fatty alcohol-glycol solvent mixture at ambient temperatures that is, temperatures at which the fatty alcohol is naturally a solid. This component also improves the plasticity and uniformity of medicant mixtures with the vehicle and provides to the vehicle smoothness and a more pleasing "feel"; hence the vehicle containing the plasticizer is more pharmacologically acceptable.
>
> The term 'compatible' is defined herein to indicate a component which will not cause separation (loss of homogeneity) of the other components, that is, the fatty alcohol and glycol solvent at temperature up to 45° C.

'930 patent, col. 2, line 69 through col. 3, line 8. The patent lists "polyethylene glycol having a molecular weight of from above 800 to 20,000, 1,2,6–hexanetriol, sorbitol, glycerol, and the like" as examples of substances that may be used as compatible plasticizers. *Id.* col. 2, lines 66–69; *see also id.* claim 4.

■ Through the declaration of Dr. Brian W. Barry, Chairman of the Postgraduate School of Studies in Pharmacy and Professor of Pharmaceutical Technology at the University of Bradford in the United Kingdom, Syntex contends that those of ordi-

nary skill in the art would understand from the '930 patent that the optional compatible plasticizer component is functional in nature.

> That is to say, the chemical candidate selected (such as glycerin) must actually function to improve plasticity and/or maintain homogeneity in the specific composition in question in order to be considered a compatible plasticizer in that composition....
>
> ... Those skilled in the art reading the '930 patent would understand that whether a given chemical candidate performs the compatible plasticizer function depends on the specific candidate, its concentration, and the other components of the composition and their concentrations.

Barry Decl. ¶¶ 22–23. K–Line, Roaco and Drug Guild have not disputed this functional definition. Indeed, they have apparently adopted it. *See* Reynolds Rep. at 2, 4; K–Line's Proposed Findings of Fact ¶ 30. There is thus no genuine dispute that this definition is proper and the Court will adopt it as a matter of law. *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 985–89 (Fed.Cir.1988) (noting that "plasticizer" is defined functionally).

■ K–Line *et al.* place great emphasis on the fact that the only suggested use for glycerin in the '930 patent is as a compatible plasticizer. As if that were not clear from a reading of the patent alone, they cite the deposition testimony of Dr. Katz; Dr. Boyd Poulsen, a Syntex expert; and Dr. Barry himself. Katz Dep. at 236; Poulsen Dep. at 171; Barry Dep. at 55–56. Syntex does not dispute this fact, and the Court therefore finds as a matter of law that the only suggested use for glycerin in the '930 patent is as a compatible plasticizer.

■ Syntex notes, however, that glycerin is known to those skilled in the art as serving purposes other than plasticization, for example, as a solvent and/or humectant. Barry Decl. ¶ 24. Indeed, Syntex's British Patent No. 1,338,923 (Nov.1973) teaches that glycerin functions as a co-sol-

11. *See infra* note 20.

vent rather than as a plasticizer when used in concentrations of 10 to 25% in FAPG compositions. *Id.* Exh. C, at 2, lines 24–30. A 1971 publication by Syntex researchers similarly shows glycerin functioning as a solvent. *See id.* Exh. D, at 394–95 & Table I. In describing the uses of glycerin, a pharmacological treatise lists "solvent" first. *See* Remington's Practice of Pharmacy (Syntex's Proposed Findings of Fact and Conclusions of Law Exh. 5) 1345 (12th ed. 1961). Dr. Fotios Plakogiannis, K–Line and Roaco's own expert, conceded at his deposition that glycerin serves many possible functions. Plakogiannis Dep. at 84. Absent any genuine factual dispute on this matter, the Court therefore holds as a matter of law that glycerin may serve other purposes in an FAPG compound, including that of a co-solvent or humectant.[12]

The Court sees no contradiction between this holding and the fact that the '930 patent mentions glycerin only as a candidate for compatible plasticizer. The teaching of the patent and the extrinsic evidence of how one skilled in the art would interpret that patent are, in this case, complementary. Certainly nothing in the '930 patent precludes the use of glycerin for any of the other purposes for which it is known to those skilled in the art. Contrary to the view of K–Line *et al.*, this is not a case where a patentee is attempting to change the meaning of a term defined in the patent. *Cf. Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 888–89 (Fed.Cir.1984). In *Lear Siegler* the court prohibited a party from changing the definition of a term ("threaded into") from the definition given in the patent. Here, in contrast, the patent does not define "glycerin" as a compatible plasticizer; it defines "compatible plasticizer" functionally and then lists glycerin as an example of such a plasticizer. Syntex has not attempted to change the functional definition of compatible plasticizer given in the patent but has merely explicated that definition through a person skilled in the art.

■■■■ The remaining question, then, is whether all of the glycerin in Vasoderm functions as a compatible plasticizer or whether only a small enough portion of it does so that the 15% compatible plasticizer limitation in the '930 patent is not exceeded.

Syntex contends, through the Barry declaration, that one skilled in the art would measure plasticity, which is a rheological property, through a technique known as kinematic viscometry. Dr. Barry performed kinematic viscometry on Vasoderm and concluded that most of the glycerin in Vasoderm does not function as a plasticizer.[13] Specifically, Dr. Gillian Margaret Eccleston, working under Dr. Barry's supervision, prepared 0.05% fluocinonide cream compositions analogous to Vasoderm but having varying amounts of glycerin, from 0% to the 21% present in Vasoderm as commercially sold. *See* Barry Decl. ¶ 25 & following table. Dr. Eccleston performed rheological studies on the different preparations. The resulting rheograms, according to Dr. Barry, "are very similar over the range of 0 to 21% glycerin and show that glycerin is not affecting the plasticity and is not, therefore, functioning as a compat-

---

**12.** *See also* Transcript of Oral Argument, May 23, 1988, at 71, 79 (where counsel for K–Line, Roaco and Drug Guild concede that glycerin can perform functions other than as a plasticizer). Interestingly, one of K–Line's experts has had no trouble concluding that the PEG 800–20,000 in Vasoderm is not functioning as a compatible plasticizer. *See supra* note 7.

**13.** K–Line, Roaco and Drug Guild object to the Barry declaration because he did not personally carry out all the tests discussed therein. The tests were, however, carried out under Dr. Barry's supervision and control by a person who he trained; he has vouched for the accuracy of her work. *See* Barry Dep. at 148–49; Eccleston

Decl. ¶¶ 4–5. The ex parte tests conducted by or on behalf of Dr. Barry are admissible because K–Line *et al.* have had the opportunity, at the December 17, 1987 deposition of Dr. Barry, to inquire as to the details of each test in an attempt to discredit or distinguish the results obtained therefrom. *See Congoleum Industries v. Armstrong Cork Co.*, 319 F.Supp. 714, 716 (E.D.Pa.1970); *see also Chemical Engineering Corp. v. Essef Industries*, 795 F.2d 1565, 1568 n. 3 (Fed.Cir.1986). In any event, as counsel for Roaco conceded at oral argument, any hearsay problems could presumably be cured at trial. Transcript of Oral Argument, May 23, 1988, at 73; *see* Fed.R.Evid. 703.

ible plasticizer in Vasoderm." Barry Decl. ¶ 26; *see id.* Exh. E. Dr. Barry also examined rheological studies performed by Dr. Eccleston on compositions analogous to Vasoderm but having varying amounts of PEG ranging from 0% to the 9% present in Vasoderm. In contrast to the first set of rheograms, the second set, according to Dr. Barry, shows that the PEG does affect the plasticity and therefore functions as a plasticizer in Vasoderm. *Id.* ¶ 26; *id.* Exh. F.[14]

Having examined the plasticizer component of "compatible plasticizer," Dr. Barry turned his attention to the compatibility component, which requires that the substance maintain homogeneity. From photomicrographs of the set of compositions with the varying amounts of glycerin,[15] Dr. Barry observed that the compositions with 0%, 1.25% and 3.07% glycerin were of similar homogeneity, but that the compositions with 4.89%, 11.24% and 21.0% glycerin were of decreasing homogeneity. In other words, he observed that above a glycerin content of 3.07%, homogeneity decreases with increasing glycerin content. This observation led Dr. Barry to conclude that glycerin, or at least amounts above 3% by weight of glycerin, is not "compatible" and thus reinforced his conclusion that glycerin does not function as a compatible plasticizer in Vasoderm. Barry Decl. ¶ 27; *id.* Exh. G. Dr. Barry's examination of photomicrographs of the second set of experimental preparations (that is, those containing varying amounts of PEG), in contrast, again revealed that homogeneity does not decrease with increasing amounts of PEG, reinforcing the conclusion that PEG in fact

functions as a compatible plasticizer. *Id.* ¶ 27; *id.* Exh. H.[16]

In opposition to the extensive testing performed by Drs. Barry and Eccleston and proffered by Syntex, K–Line *et al.* have offered no similar scientific analysis of their own to show that the glycerin, in whole or in large part, functions as a compatible plasticizer in Vasoderm. For example, they have not proffered any rheological studies, despite an implicit acknowledgment by their own expert, Dr. Plakogiannis, that such studies, more particularly kinematic viscometry, are the proper method of determining the flexibility or plasticity of a substance. *See* Plakogiannis Dep. at 87–88. Instead, they focus hypnotically on the fact that the only use for glycerin mentioned in the patent is as a compatible plasticizer. The Court has already noted this point but has held that the patent in no way precludes the use of glycerin for other purposes generally accepted in the art.

K–Line, Roaco and Drug Guild do proffer several documents that purport to show that the glycerin in Vasoderm functions as a compatible plasticizer, but all of these are qualitatively inferior to the Barry declaration because they are either conclusory in nature or are not based on scientific analysis accepted in the art. First, Lakhani, the inventor of Vasoderm, avers that the glycerin in Vasoderm functions as a compatible plasticizer, but his conclusion is based on the measurement of simple viscosity, which, in contrast to kinematic viscometry, is not accepted in the art as a method of evaluating plasticity. *See* Lakhani Dep. (Cobrin Decl.Exh. 2) at 104–08; *see also* Lakhani Aff. ¶¶ 8–10. Second, Dr. Plakogi-

14. *But see supra* note 7 (noting that a K–Line expert believes that PEG does not act as a compatible plasticizer in Vasoderm).

15. At his deposition, Lakhani confirmed that photomicrography was the appropriate way of determining whether a substance is maintaining homogeneity, that is, whether it is compatible. Lakhani Dep. at 192.

16. In his declaration Dr. Barry also cites phase partition tests that were conducted on Vasoderm, in which stearyl alcohol and glycerin were equilibrated in the same proportions used in Vasoderm. He observed that only about 2% of the glycerin partitioned into the stearyl alco-

hol, which "strongly suggests" that only a small amount of the glycerin in Vasoderm can function as a compatible plasticizer. Barry Decl. ¶ 28. These tests are probably inadmissible on the current record because Dr. Barry has acknowledged that he cannot identify the person who carried them out. *See* Barry Dep. at 149. Because the phase partition studies did not form the basis for Dr. Barry's conclusions, however, but merely reinforced the conclusions he reached through the rheological studies and the photomicrographs, *see id.,* their inadmissibility does not detract from Dr. Barry's conclusions.

annis, in his expert report, states that the glycerin in Vasoderm functions as a compatible plasticizer, but fails to give any reasoned basis for this conclusion. *See* Plakogiannis Rep. at 4. Finally, Grant Reynolds, the Plant Manager at Taro Pharmaceuticals, Inc. (as K–Line is now known), concludes that the glycerin in Vasoderm functions as a compatible plasticizer. *See* Reynolds Rep. at 4. But his report is conclusory in nature and is not founded on scientific tests. The body of the report is an irrelevant dissertation on the Vasoderm manufacturing process, which, Reynolds notes, results in a two-phase system. *Id.* at 2–3. The report then leaps to the following conclusion:

> In this system, there is only one solvent, i.e. propylene glycol. In addition, the glycerine functions as a plasticizer because it acts to soften the micelles of the internal phase, which micelles contain the plastic to be softened, i.e. polyethylene glycol 6000.
>
> Based on the above, it is my opinion that glycerine functions as a plasticizer in Vasoderm Cream. Also, I have visually observed Vasoderm Cream on numerous occasions, and I have never seen it separate. Therefore, I conclude that the glycerine is compatible with the other ingredients in Vasoderm Cream.

*Id.* at 4.

Not only have K–Line *et al.* failed to offer any studies comparable to that of Dr. Barry, but they have made no effort to attack the merits of the Barry declaration.[17] Through the report of Dr. Plakogiannis, K–Line *et al.* do attack the affidavit of Dr. Poulsen, another Syntex expert, who concluded that the glycerin in Vasoderm functions as a co-solvent. But even this attempt is half-hearted and conclusory;

Plakogiannis stated that he "disagree[s]" with the Poulsen conclusion because, in his view, "there is no need for a co-solvent in this type of cream and consequently no component functions as such." Plakogiannis Rep. at 4. And even if the Court were to read the Plakogiannis report as creating a genuine issue as to whether the glycerin in Vasoderm may function as a co-solvent, K–Line *et al.* have in no way ruled out the possibility that the glycerin in Vasoderm performs some non-plasticizer function other than co-solvent, for example, as a humectant. Indeed, in its application to the Food and Drug Administration, K–Line identified the glycerin in Vasoderm only as a "humectant; solvent" and nowhere cited it as a plasticizer. *See* Syntex's Proposed Findings of Fact and Conclusions of Law Exh. 4, at 000192.[18] K–Line, Roaco and Drug Guild have likewise failed to substantiate a last-ditch argument by counsel for K–Line that the glycerin in Vasoderm may be functioning both as a compatible plasticizer and in some other way. *See* Transcript of Oral Argument, May 23, 1988, at 79.

In sum, the Court is confronted with the following evidence: on the one hand, the Barry declaration, which supports Syntex's contentions, and which is based on scientific procedures recognized in the art; on the other hand, the Lakhani affidavit and the Reynolds and Plakogiannis reports, which support the contentions of K–Line *et al.*, but which are all either conclusory in nature or unsupported by recognized scientific procedures. The Court need not engage in the weighing of evidence to conclude that the evidence submitted by K–Line, Roaco and Drug Guild is insufficient as a matter of law to rebut the evidence submitted by Syntex. Expert opinion testi-

---

17. In contrast, K–Line, Roaco and Drug Guild have fiercely attacked the procedural propriety of the Barry declaration, out of apparent fear of the contents of that declaration. By letter opinion and order filed January 29, 1987, Judge Lechner denied Roaco's motion in limine to preclude Syntex from claiming that Vasoderm contains less than 28% compatible plasticizer. In addition, K–Line, *et al.* have raised hearsay objections to the Barry declaration, which this Court has already overruled. *See supra* note 13.

18. Contrary to the contentions of K–Line *et al.*, Magistrate Haneke in his November 18, 1986 letter opinion and order did not make a ruling on the admissibility of K–Line's FDA application but merely declined, without explanation, a Syntex request for production of that application. *See id.* ¶ 3.

mony that is not well grounded in testing reasonably accepted by those skilled in the art is insufficiently probative to even be admissible at trial. *See Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420, 1424–25 (E.D.Tex.1986), *aff'd,* 826 F.2d 420 (5th Cir. 1987). There is a substantial qualitative difference in the type of evidence submitted by the parties, and the Court finds the evidence so one-sided that there are no material issues of fact. *See Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. The Court concludes, as a matter of law, that no more than 3 of the 21 parts per 100 of glycerin in Vasoderm function as compatible plasticizer. When this 3% is added to the 0.5% 1,2,6 hexanetriol and the 9% PEG 800–20,000 that are presumably functioning as compatible plasticizers,[19] Vasoderm contains no more than 12.5% compatible plasticizer. Considering the admission of K–Line *et al.* that Vasoderm satisfies all of the other elements of the '930 patent, the Court holds that Vasoderm literally infringes the patent.[20] Therefore Syntex is entitled to judgment as a matter of law. The Court will deny the motion of K–Line, Roaco and Drug Guild for summary judgment of noninfringement and grant Syntex's cross-motion for summary judgment of infringement.

■ This holding is not inconsistent with Chief Judge Fisher's holding in the early stages of this litigation that "on this record" there could be no literal infringement. *See* Opinion of August 16, 1985, at 8. Judge Fisher was ruling on a preliminary injunction and was called upon to hazard a guess as to the ultimate outcome of the litigation. He specifically noted that only limited proofs had been submitted and limited his ruling to the "purposes of the instant motion." *Id.* at 9. The record has sufficiently changed with the submission of the Barry declaration that it not only now allows, but compels, a finding of literal infringement.

Despite his best intentions—the Court will assume that his intentions were pure—Subhan Lakhani was unsuccessful in his attempt to design around the '930 patent. He apparently fixated on the 0–15% compatible plasticizer limitation, and the fact that the patent mentioned glycerin as an example of such a plasticizer, without considering the possibility that the glycerin in his composition was not functioning as such. He has thus fallen prey to his own misreading of the '930 patent, and K–Line, Roaco and Drug Guild have fallen with him.

Because of the Court's holding with regard to literal infringement, it need not reach the issue of whether Vasoderm infringes under the doctrine of equivalents. Since Vasoderm falls clearly within claim 8 of the '930 patent, "infringement is made out, and that is the end of it." *Graver,* 339 U.S. at 607, 70 S.Ct. at 855.

## CONCLUSION

Having determined that the '930 patent is valid as a matter of law, the Court will deny K–Line and Drug Guild's motion for summary judgment of patent invalidity. Having determined that the accused Vasoderm product does indeed contain 0–15% compatible plasticizer and therefore literally infringes the patent, the Court will deny the motion of K–Line, Roaco and Drug Guild for summary judgment of noninfringement and will grant Syntex's cross-motion for summary judgment of infringement. Trial on the issue of damages is set down for November 6, 1989 at 9:00 a.m. Within two weeks of the date hereof, the parties shall submit letter-briefs to the Court detailing the issues that remain in this case and recommending a method for the speedy resolution of those issues.

An appropriate order has been filed herewith.

---

**19.** The Court assumes for purposes of this motion that the 1,2,6 hexanetriol and the PEG 800–20,000 function as compatible plasticizers in Vasoderm. *See supra* note 7.

**20.** In light of this holding, the Court need not reach Syntex's alternative argument that the 15% upper limit on compatible plasticizer is merely advisory, not mandatory, and that even a product with more than 15% compatible plasticizer can literally infringe the patent.

ORDER

For the reasons set forth in the Court's opinion filed herewith,

It is on this 18th day of September, 1989

ORDERED that K–Line and Drug Guild's motion for summary judgment based on patent invalidity is denied; and it is further

ORDERED that K–Line, Roaco and Drug Guild's motion for summary judgment of noninfringement is denied; and it is further

ORDERED that Syntex's cross-motion for summary judgment of infringement is granted; and it is further

ORDERED that trial on the issue of damages is set down for November 6, 1989 at 9:00 a.m.; and it is further

ORDERED that within two (2) weeks of the date hereof, the parties shall submit letter-briefs to the Court detailing the issues that remain in this case and recommending a method for the speedy resolution of those issues.