Frank MANCUSO, Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso and F. Mancuso Boat Yard, Inc. d/b/a Echo Bay Marine, Plaintiffs,

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.**

No. 93 Civ. 0001 (WCC).

United States District Court, S.D. New York.

July 2, 1997.

As Amended July 16, 1997.

Law Offices of John A. Tartaglia, White Plains, NY (John A. Tartaglia, of counsel), for Plaintiffs.

Charles E. McTiernan, Jr., Consolidated Edison Company of New York, Inc., New York City (Richard J. Giglio, of counsel), for Defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Frank, Ellen, Deanna and Theresa Mancuso ("the Mancusos") brought this action against Defendants Consolidated Edison Co. of New York ("ConEd"), as a citizen suit under the Clean Water Act, *see* 33 U.S.C. § 1365, with pendent claims under New York state law for personal injuries and property damage allegedly caused by PCB contamination of their property. On November 3, 1995 we issued an Opinion and Order reaffirming Judge Broderick's dismissal of plaintiffs' state law claims for property damage because they are barred by the statute of limitations. ConEd now brings a two-part motion: (1) in limine, under the authority of *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Fed.R.Ev. 702, seeking an order excluding the testimony of Drs. Schwartz and Dietrich, two of the Mancusos' experts on their personal injury claims; (2) granting partial summary judgment against the Mancusos on all of their personal injury claims pursuant to Fed.R.Civ.P. 56(b). For the reasons discussed below, we grant ConEd's motion in limine to exclude the testimony of Dr. Schwartz, but deny its motion to exclude that of Dr. Dietrich. We also deny ConEd's motion for summary judgment.

### BACKGROUND

In October 1987, plaintiffs purchased Echo Bay Marina from Robert Kolasch. Frank Mancuso personally ran the marina, and his family "spent a lot of time" there. In the summer of 1988, they decided to move to the premises, (F. Mancuso Trans. at 1399), where they resided for approximately four and one-half years. (Comb.Stmt.¶ 112). The marina is adjacent to an electrical substation owned and formerly operated by ConEd. PCBs were used in some of the equipment at the site, particularly in several transformers. ConEd ceased using the substation in 1981 and has since been engaged, intermittently, in dismantling and cleaning it up under the watchful eye of the New York State Department of Environmental Conservation (N.Y.SDEC).[1]

The parties offer widely differing views of the historical and current levels of PCBs in

---

1. On June 15, 1992, ConEd entered into an Order on Consent with the NYSDEC providing for a preliminary site assessment of the Echo Avenue substation. (*See* "In the matter of the Development and Implementation of a Phase II Investigation Program for an Inactive Hazardous Waste Disposal Site ... Order on Consent," *attached to* Pl. 4/23/97 Ltr. "Item 36".) The Order approved a Work Plan for PCB clean-up submitted by ConEd, that included a Health and Safety Plan ("HASP") addressing possible exposure of persons at the cite to PCBs, and setting forth guidelines to minimize exposure.

In addition to the customary briefs and exhibits we rely upon to provide legal argument and factual background to decide a motion, we have relied upon numerous letters sent to the court by the parties. We have done so because the Mancusos' submissions in opposition to ConEd's motion, which read more like an essay than legal argument, are a rather maddening conglomeration of unsupported assertions and "summations" of documents "available to the court and the Defendant" (upon request). Although we attempted to find a documentary basis in plaintiffs' submissions for many of their assertions, in some cases we were simply unable to locate one. In others, we requested additional documents and other support from the plaintiffs by letter, and allowed defendant to respond. These letter submissions have been individually docketed.

the soil at the ConEd cite and on the Mancusos' property, and of the threshold level of PCBs that constitute a health and safety risk. Plaintiffs devote many pages of their submissions to evidence that there have been, and may still be, highly elevated levels of PCBs at the Echo Avenue Substation. For example, they point out that a 1987 test of a soil sample revealed a PCB level of 5400 ppm in the rear yard of the substation. (Pl. Comb.Stmt.¶ 67.) In page after page of their "Combined Statement" plaintiffs enumerate the levels of PCBs in some of ConEd's equipment, such as transformers that were built using oil containing PCBs. They also describe in detail the soil contamination levels in certain spots on ConEd's property, particularly near the transformer moats. (See e.g. Pl. Comb. Stmt. ¶¶ 39–40, 46–47, 48A–H, 50–59.) These PCB levels are much higher than those on the Mancusos' property. Plaintiffs' own expert, Dr. Webber, conducted an analysis in 1994 that revealed soil concentrations on the Mancusos' property ranging from a low of 3.46 ppm to a high of 7.31 ppm by weight. (Exh. L.)[2] ConEd's expert tested forty samples from the Mancuso's property: 34 had PCB levels less than 1 ppm; 5 had levels between 1 ppm and 1.37 ppm, and a sample had 232 ppm. (See Id. Exh. M.)

In response, ConEd urges that with the exception of the 232 ppm sample, the numbers on the Mancusos' property are low. It points out that the Food and Drug Administration ("FDA") allows fish with 2 ppm PCBs to be sold for human consumption and food sold for human consumption to be wrapped in paper containing PCB levels of 10 ppm. 21 C.F.R. § 109.30(a)(7). Plaintiffs counter that N.Y.S. Department of Health issues advisories warning residents not to eat marine bluefish and striped bass, or eels from the Long Island Sound more than once a week. (See Pl. Ltr. of 5/20/97 at 14.) We note, however, that in 1986 the City of New Rochelle's environmental consultant stated in a report that "it appears that much of the

[substation] site, but in particular the northwest corner, is contaminated with trace levels of PCBs and appreciable amounts of oil." (Pl. Comb. Stmt. ¶ 60 (emphasis added).)

With regard to the threshold levels of PCBs that cause harm to humans, the Mancusos point out that NYSDEC determined that the requisite clean-up level for PCBs in the soil at Echo Bay is 1 part per million (ppm) under both New York State Department of Health and EPA regulations. (See 7/22/93 NYSDEC internal memo and 2/28/94 NYSDEC Ltr. to ConEd's Manager of Waste Programs, attached to Pl. 4/23/97 Ltr. "Item # 36".) They argue that anything over these levels is unsafe, that ConEd has not satisfactorily cleaned up the site and that PCBs from the site have migrated to the air, soil and water of their property and have caused various family members who worked and/or resided on the property to suffer numerous physical ailments. Frank Mancuso, 49, complains of baldness, a patch of discoloration on his leg, irritation of hair follicles on his arms, past fatigue, headaches and acne. Ellen Mancuso, 40, complains of a recurring rash and irritated hair follicles. Deanna, 14, complains of recurrent post-nasal drip and rashes. Theresa Mancuso, 6, who was born while the Mancusos were living at the Marina, allegedly suffers from temper tantrums, a learning disability and occasional rashes as a result of prenatal exposure to PCBs. All four family members allege that as a result of exposure to PCBs they suffer from "sensitization syndrome," i.e. hypersensitivity to common chemicals, although the only manifestation of this "syndrome" in the record appears to be Deanna's post-nasal drip. ConEd vigorously contests plaintiffs arguments regarding "safe" levels and their assertions that their injuries were caused by PCBs.

Essential to plaintiffs' case is the expert testimony of Drs. Howard Schwartz and

---

**2.** Dr. Webber also performed an analysis in which he separated the oil from the sediment, and recalculated the concentrations of PCBs. His results ranged from 131–543 ppm. (See Exh. L at 2.) ConEd is quite critical of his methodology, however, see Reply brief n. 6, alleging that such testing departs from the prescribed scientific and regulatory testing protocol in 40 C.F.R. 761.125(c)(2)(ii). We have not been asked and thus decline to rule on the acceptability of this methodology now, but we do note that Dr. Webber's results further evidence the wide divide between the Mancusos' and ConEd's positions on the contamination levels at Echo Bay.

Jeanne Dietrich. If permitted to take the stand, Dr. Schwartz would testify that in his opinion, plaintiffs' aforementioned ailments were caused by exposure to PCBs emanating from ConEd's substation. Dr. Dietrich would testify that Theresa Mancuso suffers from a learning disability. ConEd has moved to preclude Dr. Schwartz's and Dr. Dietrich's testimony under Fed.R.Ev. 702, as construed in *Daubert.*

## DISCUSSION

I. *Legal Standards for the Admission of Expert Testimony*

In a landmark 1993 decision, the Supreme Court held that the traditional *Frye* rule barring expert testimony that was not based on a theory generally accepted by the scientific community had been superseded by the adoption of the Federal Rules of Evidence, in particular by Rule 702 which governs the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 587–88, 113 S.Ct. 2786, 2793–94, 125 L.Ed.2d 469 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED.R.EV. 702. The Court was quick to warn that *Frye*'s displacement by the Rules of Evidence does not mean that the "rules themselves place no limits on the admissibility of purportedly scientific evidence." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. "To the contrary, under the Rules, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.*

The Court then elaborated on the test lower courts must apply in evaluating scientific evidence under the Federal Rules. It explained that under Rule 702 "the adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 589–590, 113 S.Ct. at 2795. It provided five factors that judges must examine in order to determine whether an expert's testimony is "scientifically valid" 1) whether the theory had been tested, 2) whether it had been subjected to peer review, 3) what the potential or known rate of error is, 4) what sort of standards control the technique's operation, 5) whether the theory or technique has been generally accepted. *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996), (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). Furthermore, in order to "assist the trier of fact to understand the evidence or to determine a fact in issue," the evidence must "fit" the inquiry. This means that there must be a "valid scientific connection to the pertinent inquiry as a precondition of admissibility." *Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2796.

■ The Second Circuit has interpreted these guidelines to require that "expert testimony should be excluded if it is speculative or conjectural," "or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (citations omitted). Moreover, Rule 703 gives district courts discretion "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Id.*[3] "Other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Id.* A trial judge has "broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Id.* We must now apply these principles to determine the admissibili-

---

3. Rule 703 provides that:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in that particular filed in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 FED.R.EV. 703.

ty of the testimony of Dr. Schwartz and Dr. Dietrich.

## II. *Dr. Schwartz*

In support of its motion to exclude the testimony of Dr. Schwartz, ConEd makes three basic arguments. First, it contends that Dr. Schwartz does not have sufficient knowledge or experience to express an expert opinion that PCB exposure caused plaintiffs' ailments. Second, it argues that Dr. Schwartz failed to follow proper scientific methods in arriving at his conclusions. Third, it contends that scientific literature on PCBs establishes that PCBs were not the cause of plaintiffs' ailments. For the reasons set forth below, we agree with ConEd on its first two points, but decline to reach the third.

### A. *Dr. Schwartz's Qualifications*

Rule 702 requires that an expert be sufficiently qualified in order to testify. FED. R.CIV.P. 702. In general, this qualification requirement has been interpreted liberally. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). In *Paoli*, the Third Circuit held that "exclusion is improper simply because an expert does not have the appropriate degree or training." *Id.* There, the court allowed an internist who had spent "significant time reviewing the literature on PCBs" to testify that they caused the plaintiffs' illnesses. *Id.* at 754. The Second Circuit apparently follows this liberal interpretation. It has allowed an otolaryngologist to testify that a throat problem was caused by exposure to glue fumes, dismissing defendant's argument that the witness was not qualified because he was not an expert in environmental medicine as an "unwarranted expansion of the gatekeeper role announced in *Daubert.*" *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995). Although he did not have formal training, the court concluded that the witness' "extensive practical experience" qualified him to testify. *Id.*

Although the qualification requirement is liberally construed, it is not a nullity. After a careful analysis of *Paoli*, the New Jersey District Court disqualified a pulmonologist from testifying that plaintiff suffered from a platinum allergy. *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 372–73 (D.N.J.1995). The district court observed that the witness was neither an epidemiologist nor a toxicologist, and that he had "no other qualifications other than his medical education and his years practicing as a pulmonologist." *Id.* It noted that he had only "casually studied the literature on platinum allergy," skimming several articles that he was unable to remember clearly, and that he had never previously treated a patient suffering from a platinum allergy. *Id.* Similarly, another district court found a witness who was educated as a pediatrician, pharmacologist, and toxicologist unqualified to testify regarding the cause of birth defects because he had merely reviewed selected literature on the subject for the purposes of litigation. *Wade–Greaux v. Whitehall Labs., Inc.*, 874 F.Supp. 1441, 1476 (D.Vi.), *aff'd without opinion*, 46 F.3d 1120 (3d Cir.1994).

In support of its contention that Dr. Schwartz does not have the proper qualifications to testify that PCBs caused plaintiffs' injuries, even under Rule 702's lenient standard, ConEd asserts that:

> Dr. Schwartz is an internist who specializes in testifying for plaintiffs in medical malpractice cases. (Exh. S [Schwartz Trans.], p. 13). Although he is constantly in court, he has never testified in a toxic tort case and has never been qualified as an expert in an environmental case (Exh. S, p. 37–38, 52). He is not a toxicologist; has treated patients exposed to PCBs only twice (in the late 1960's and early 1970's); has no training in environmental medicine, occupational medicine, or PCBs; has no experience in giving lectures/seminars on PCBs or even *attending* such lectures; and has written no articles on toxicology, environmental diseases or toxins (*id.* at 51, 53, 75–76). Last, but certainly not least, plaintiffs' lawyer had to give Dr. Schwartz books to acquaint him with the possible health effects of PCBs and did so after Dr. Schwartz had reached his conclusions (*id.* at 103–104, 167).

(Def. Br. at 25.)

■ These assertions are largely accurate; indeed, almost all of them are taken from Dr.

Schwartz's own testimony.[4] While he admitted that he has no training in environmental medicine, he stated that in the course of his training "many patients had environmental problems and that was encompassed within the field of internal medicine." (Schwartz Trans. at 66.) While Dr. Schwartz need not be a specialist in environmental medicine in order to testify as an expert, *see McCulloch, supra,* he must have some specialized knowledge regarding the effects of PCBs on living creatures, either as a result of training or experience. He appears to have neither.

Dr. Schwartz testified that although he had no formal training regarding PCBs, he had "informal" training, through his "own self-education probably beginning with the early 1980's." (Schwartz Trans. at 69.) He stated that he "self-educated" himself "[b]y reading journals." (*Id.*) "I must say," he added, "I came upon the initial readings as I recall accidentally. I didn't at that point even know what the word dioxin meant. I thought they misspelled the word and mean digoxin. When I first encountered the word, I recognized it was a term I had not known before the 1980's." (*Id.*) In total, he estimated that before the Mancusos came to him, he had read 40 or 50 articles since the early 1980's, "either in part or complete, on some aspects of PCBs." (*Id.* at 70–71.) He explained that he read these journals because endocrinology and metabolism were areas of strong interest to him and that these articles mainly brought out "similarities between the manner in which hormones are degraded in animals and similarities to the way some of these materials [PCBs] are degraded but these were not clinical journals." (*Id.*). Generally, given the lenient standard applied to an expert's qualifications, we might accept

such "self-education" as sufficient to permit him to testify. However, his assertions that he "self-educated" himself on PCBs are controverted by several troubling facts in the record.

First, Dr. Schwartz's alleged expertise in the toxic effects of PCBs is belied by the fact that when his initial expert report, dated March 31, 1995, was rejected as insufficient by Magistrate Judge Fox, apparently because it failed, *inter alia,* to list the "data and other information considered by the witness" in forming his opinion that plaintiffs' injuries were caused by PCBs, as required under FED.R.CIV.P. 26(a)(2)(B), plaintiffs' attorney sent Dr. Schwartz a "large number of documents," including at least two reference books on PCBs.[5] (*Id.* at 187, 166–167.) In Dr. Schwartz's amended report of July 27, 1995, he lists the two books given to him by plaintiffs' attorney as the first two references upon which he relies. (Supl. Rept. at 2, Exh. NN.) This court cannot understand why a medical doctor, offered as an expert in diagnosing PCB exposure, would need to rely upon the attorney for the plaintiff to supply him with the relevant scientific literature on PCBs. We cannot help but conclude that Dr. Schwartz was not in fact an expert in PCBs when he was hired by plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such by a selective review of the relevant literature.

The second troubling fact is that despite his testimony that he had read 40 or 50 articles over the course of fifteen years before authoring his initial opinion, and that he subsequently performed approximately 14–15 hours of library research and review before authoring his supplemental opinion and appearing for his deposition, (Schwartz Trans.

---

**4.** The only assertions that were not fair representations of Dr. Schwartz's testimony were that Dr. Schwartz is a "specialist" in medical malpractice testimony and that he is "constantly in court." This characterization is overstated. While Dr. Schwartz has testified in at least 16 trials in the past four years, he maintains an active, apparently full-time medical practice treating patients. (6/27/95 Supl. 26(a)(2)(B) Rept. of Dr. Schwartz at 3, Exh. NN; Schwartz Trans. at 48.) Dr. Schwartz was asked numerous questions at his deposition about his several appearances as an expert witness at trial. Although he was often unable to recall even the general nature of the

claims involved in his previous testimonies, including cases in which he had testified only a month or two previously, he was able to state that they all involved medical malpractice. (*See* Schwartz Trans. at 13–37.)

**5.** These books were: 1) *Polychlorinated Biphenyls and Terphenyls* (2d Ed.), Environmental Health Criteria 140, Published by the World Health Organization, Geneva 1993; 2) *Dioxins and Health,* Edited by Arnold Schecter, Published by Plenum Press, New York 1994.

at 184–5), Dr. Schwartz was unable to answer critical questions regarding PCBs. For example, Dr. Schwartz's deposition testimony revealed that he had no clear idea what levels of PCB contamination would be dangerous to humans. When asked to differentiate between an "elevated" and a "normal" PCB level in soil, he testified that he did *"not have an opinion as to what an acceptably normal number would be."* (*Id.* at 133 (emphasis added).) In fact, when pressed to be more specific, Dr. Schwartz speculated that 1 part per billion (ppb) would be an acceptable level.[6] (*Id.* at 114, 133, 178; Pl. Comb. Stmt. ¶ 138.)

This court has found no support in the record for Dr. Schwartz's statements regarding an acceptable level of one ppb in soil, even in plaintiffs' own submissions. While Dr. Webber does opine in his July 3, 1993 report that 42 ppb is the appropriate NYSDEC Department of Fish and Wildlife standard for *sediment* PCB levels at Echo Bay, (Exh. 1),[7] Dr. Schwartz apparently believed that the ppb standard applied to soil, (Schwartz Trans. at 179 ("[b]ased upon what I observed in his [Dr. Webber's] reports of the numbers such as in the 40's, 40 milligrams or so per kilogram of *soil* is very substantially elevated, more than a thousand fold above the range that it should be which would be micrograms per kilogram ....")

(emphasis added)). Plaintiffs argue that this court should consider the regulatory levels set by the NYSDOH and the EPA to be "Safety Limits." These levels are 1 part per million (ppm) for soil, 1,000 times the 1 ppb limit Dr. Schwartz theorized. (*See* 2/28/94 NYSDEC letter to Konrad, *attached to* Pl. 4/23/97 Ltr. "Item # 36".) Such complete unawareness of or confusion about basic standards of PCB toxicology raises serious doubts about the efficacy of Dr. Schwartz's attempted "self-education."

Lastly, unlike the witness in *McCullock, supra,* Dr. Schwartz does not have "extensive practical experience" to substitute for his lack of formal training. In fact, he has almost no prior experience diagnosing the effects of PCB exposure. He testified that the only patients suffering from PCB exposure he could recall treating were a dozen or so firefighters he believed suffered from inhalation of smoke contaminated by PCBs. (Schwartz Trans. at 53–58.) He did not identify any symptoms which he concluded were caused by their PCB exposure, nor state the scientific basis for any such conclusion. He saw these patients over 20 years ago, in the late 1960's, "possibly" into the early 1970's. (*Id.*) Certainly this extremely limited experience with treating the effects of airborne PCBs does not amount to "significant prac-

---

6. In response to a question asking him to state what the "elevated" levels he asserted existed on the Mancusos' property actually were, he responded: "Well, if I were to assume that one part-per-billion would be a normal PCB, and I'm only making that assumption, I believe that his numbers were more in the levels of milligrams per kilogram which would be instead of in the billions, would be in the millions, .... or substantially a thousand times more than would be an acceptable level...." (*Id.* at 178.)

7. Levels in parts per billion (ppb) or parts per trillion (ppt) appear to be relevant to analysis of PCB contamination in *water* as well as in sediment. *See generally*, 6 N.Y.C.R.R. § 703.5. (Surface Water and Groundwater Quality Standards and Groundwater Effluent Standards—Polychlorinated Biphenyls). Plaintiffs also offer the Division of Fish and Wildlife and the Division of Marine Resource's "Technical Guidance for Screening Contaminated Sediments" in further support of Dr. Schwartz's statement that the relevant levels were measured in parts-per-billion. (*attached to* Pl. 5/7/97 Ltr.) While these documents discuss PCB levels in parts per bil-

lion, none of the levels indicated in these documents apply to soil, however, but to water and to sediment. (*Id.*) Moreover, these guidelines are not to protect human health, but that of benthic aquatic life, or bottom feeders, who are in "constant contact" with the sediment. (*Id.*)

Perhaps most damaging to plaintiffs' reliance on the Fish and Wildlife Guidance, however, is a February of 1996 letter from the Division of Marine Resources informing ConEd that "Even though the PCB marsh sediment concentrations approached 5 ppm, I do not believe that this area needs to be remediated because I believe that the PCBs are probably well-bound to the highly organic soils in the marsh. Hence, it is not readily bioavailable." (*See* ConEd 5/15/97 Ltr., Exh. B.) The Guidance itself states that "once a sediment has been identified as contaminated, a site-specific evaluation procedure must be employed to quantify the level of risk, establish remediation goals, and determine the appropriate risk management actions." (Guidance, supra, at 2.). Apparently, the site-specific evaluation of Echo Bay suggests clean-up levels in the parts per million range.

tical experience." We note additionally that he apparently has no experience in treating patients complaining of illnesses resulting from an exposure to PCBs in soil or water.

■ Given Dr. Schwartz's lack of formal training and credentials in general or PCB toxicology, or in environmental or occupational medicine, his inability to answer basic questions about PCB toxicology, his reliance upon plaintiffs' attorney to provide him with the scientific literature he relied upon to support his opinion, and his extremely limited experience in treating patients suffering from PCB exposure, we do not believe that Dr. Schwartz has the requisite qualifications to testify that plaintiffs' ailments were caused by exposure to PCBs, even under the lenient standards of Rule 702. Although we would be justified in ending our analysis here, we decline to do so however, because we believe that even if Dr. Schwartz were to be considered to have sufficient qualifications to be competent to testify that PCB exposure caused plaintiffs' ailments, and that his lack of credentials and experience properly goes only to the weight of his testimony, we believe that the methodology he used to ascertain the cause of plaintiffs' complaints was so fundamentally flawed that his testimony in this case would still be inadmissible.

## B. *Dr. Schwartz's Methodology*

As discussed in Part I, above, in order to qualify as "scientific knowledge" under Rule 702, an expert's opinion must have a "grounding in the methods and procedures of science" and amount to more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589–90, 113 S.Ct. at 2795. Additionally, under Rule 703, the facts and data relied upon by the expert must be of the type "reasonably relied upon by experts in that particular field." FED.R.EV. 703.

The branch of science relevant to Dr. Schwartz's proffered testimony that PCBs caused plaintiffs' illnesses is toxicology, the science of poisons. Courts have held that even if an expert seeking to testify is not a toxicologist, he must employ principles and methods of toxicology if he is to give an opinion on an issue relating to that specialty.

*Cavallo v. Star Enter.,* 892 F.Supp. 756, 771 (E.D.Va.), *aff'd in relevant part,* 100 F.3d 1150, 1159 (4th Cir.1996) (though *Daubert* liberalized rules controlling expert admissibility, the factors it established still require that the methodology and reasoning used by a witness have a significant place in the discourse of experts in the field). A central tenet of toxicology is that the "dose makes the poison" and that all chemical agents, including water, are harmful if consumed in large quantities. *See Federal Judicial Center: Reference Manual on Scientific Evidence,* "Reference Guide on Toxicology", p. 185 (1994) (hereafter "Reference Manual"). The World Health Organization, the National Academy of Sciences and various United States Government agencies have adopted the following methodology for determining the possible effects of a toxin on individuals:

[ (1) ] First, an evaluation is made of the chemicals to which the individual might have been exposed, and of the concentrations of these chemicals in air breathed by the individual. [ (2) ] The second step involves and evaluation, based on the published scientific literature, of the exposures necessary to produce the adverse effects associated with the chemicals to which individuals may be exposed. [ (3) ] These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the chemicals might have been expressed in the exposed individual.

*Cavallo,* 892 F.Supp. at 764.

■ Numerous courts have followed this method. It requires first that the expert determine the dosage of the toxin at issue to which the plaintiff was exposed. *Chikovsky v. Ortho. Pharm. Co.,* 832 F.Supp. 341, 345 (S.D.Fla.1993). Second, the expert must establish "general causation," by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges. *See Wade–Greaux,* 874 F.Supp. at 1475; *Wright v. Willamette Indus.,* 91 F.3d 1105, 1107 (8th Cir. 1996). The correlation between dosage and the response it engenders in a living organ-

ism is called the "dose-response" relationship. *Reference Manual,* p. 214. Third, the expert must establish specific causation, by demonstrating that, more likely than not, the toxin caused the plaintiff's injuries in this particular case. *Wade–Greaux,* 874 F.Supp. at 1475 (citations omitted); *In re Agent Orange Product Liability Lit.,* 611 F.Supp. 1223, 1250 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied sub nom, Lombardi v. Dow Chemical,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *Allen v. Pa. Eng., Corp.,* 102 F.3d 194, 199, (*citing Wright,* 91 F.3d at 1107). Critical to establishing specific causation is exclusion of other possible causes of the symptoms. *In re Agent Orange,* 611 F.Supp. at 1250. This method of considering all of the relevant potential causes of a plaintiff's symptoms and eliminating alternative causes based upon physical examination, clinical tests, and a thorough case history is called a "differential diagnosis." *Reference Manual,* p. 214.

■ In opposition to ConEd's contention that Dr. Schwartz was obligated to use the above methodology, plaintiffs advance various arguments. First, they discuss at length their conviction that the Echo Bay Substation was highly contaminated, and that ConEd has a poor record of honesty and compliance with government regulations and requests regarding environmental issues. However, the issue of whether Dr. Schwartz is qualified to testify does not depend on the actual level of contamination of Echo Bay or on ConEd's record of honesty and compliance. As discussed above, it depends on his qualifications, the method he employed to reach his conclusions and whether he has supported his conclusions with reference to scientific literature.

■ Next, plaintiffs argue that Dr. Schwartz need not follow the toxicological methodology in his diagnosis of the Mancu-

sos because he "has testified that a specific 'dose-response' relationship is not relevant to the evaluation of a chronic toxic exposure occurring over a long period of time." (Schwartz Aff. ¶ 5.) The only support plaintiffs offer for this statement, however, is their assertion that the cases employing a dose-response analysis are distinguishable. They try first to distinguish *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and two other cases [8] because they involve "products liability claims concerning the prescription drug Bendectin." Second, they attempt to distinguish cases, such as *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376 (C.D.Ill.), *aff'd,* 13 F.3d 1090 (7th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994), and *Cavallo,* 892 F.Supp. 756, because they involve "single acute, or very short term toxic exposure to chemicals not generally accepted in the scientific community as causing the toxic syndromes suffered." We are not persuaded by these attempted distinctions, however.

It is beyond cavil that *Daubert* and its progeny control the analysis of the admissibility of expert scientific testimony, regardless of the precise area of science or particular chemical at issue. Regarding the importance of *Daubert, see, e.g.,* David M. Levy, *Scientific Evidence after Daubert,* LITIG., Fall 1995, at 48. While it is true that many of the cases construing *Daubert* focus mainly upon an analysis of whether the scientific community accepts that the chemical at issue causes the ailments complained of by the plaintiffs, an issue that we decline to reach, the critical holding in *Daubert* was that the Federal Rules of Evidence apply to questions of the admissibility of expert testimony. This holding gives the case a tremendous sweep, making it relevant to almost every question of expert analysis.[9]

---

8. Rather than considering all of the cases "distinguished" by plaintiffs, we address only those cases that we relied upon in reaching our decision on this motion.

9. Some of the cases cited by plaintiffs do not even support their argument that dosage is not relevant in cases involving known toxins. In *O'Conner,* for example, the chemical at issue was widely accepted as causing the symptoms al-

leged. *O'Conner,* 807 F.Supp. at 1382 ("extensive discovery has established that there is a national and an international scientific consensus on the biological effects of ionizing radiation causing cataract formation in the lens of the eye.") The critical question for the court in *O'Conner* was at *what dosage* these effects are manifested. *Id.* at 1380–86, 1396.

Plaintiffs next attempt to evade a dose-response analysis by asserting that PCBs "are generally accepted in the scientific community, as well by as Con Edison, as causing the illnesses and syndromes diagnosed in the Mancuso family," and that therefore they need not provide rigorous evidence of causation. However, they have established neither the factual premise nor the conclusion of their syllogism.

We are not persuaded at this point that the scientific community "generally accepts" that PCBs cause all of the ailments plaintiffs allege in this action. The sole support advanced for this assertion is the opinion of Dr. Schwartz, whose expertise in the field is minimal. In his reports, Dr. Schwartz does not quote from or even discuss scientific studies or textbooks, but merely provides a list of the literature on which he claims to have relied. Nor, with the exception of an article on intellectual impairment, does he provide any copies of this literature to this Court. Such an offer of proof is unacceptable. *See O'Conner,* 807 F.Supp. at 1392 (citations omitted) ("The mere recitation of a list of studies is not a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis.")

By contrast, ConEd's experts, who are far better qualified in this area than Dr. Schwartz,[10] maintain that in fact, several of the Mancusos' illnesses such as-baldness, bronchospasm and sensitization syndrome are not generally accepted as being caused by PCBs. (*See* Def. Br. at 45, 48; Exh. AA, OO, BB.) In addition, they argue that reference to established medical texts shows that plaintiffs' medical histories are inconsistent with syndromes that are known to be caused by PCBs. For example, Dr. Cohen concluded that plaintiffs did not have chloracne because the records showed that Dr. Klar treated all

of them with topical steroids and, as a result, their infections either cleared up entirely, or substantially improved. (9/23/93 Ltr. from Klar to Tartaglia, Exh. B.) According to Dr. Cohen, acnes such as chloracne, a hallmark indication of PCB exposure, are known to respond adversely to corticosteroids. (Exh. BB at 1, (citing *Plewig's Acne and Rosacea*).) As further support for his conclusion, he noted that Mr. Mancuso testified that his pimples "itched," (F. Mancuso Trans. at 187, 201, 1475–76), as did Mrs. Mancuso, (E. Mancuso Trans. at 48), and that patients suffering from chloracne do not complain of itching, (*id.,* (*also citing Fitzpatrick's Dermatology in General Medicine Fourth Edition*)). Thus, although we decline to rule on whether the literature supports all of plaintiffs' ailments at this time, we do note that based upon the record before this Court, plaintiffs certainly have not established that it is generally accepted that PCB exposure could have caused their symptoms.

Nor do we accept plaintiffs' argument that ConEd's documents admit that "minute exposure can be extremely hazardous," and that therefore Dr. Schwartz did not need to know more than that plaintiffs were exposed to minute levels of PCBs before making his diagnoses. Plaintiffs apparently base this argument upon ConEd's Echo Avenue Substation HASP ("Health and Safety Plan"), the Order on Consent entered into with NYSDEC, a ConEd "Field Guide for the Cleanup of Dielectric Fluid Spills and fires Containing PCBs," and a ConEd memorandum entitled "Comprehensive Emergency Response Plan for Hazardous Materials Incidents." (*See* Pl. Br. at 11, (citing Comb. Stmt. Parts III & IV).) These documents were written either as a guide for the cleanup of the *substation* in order to comply with NYSDEC or OSHA requirements, or to address hazardous materials *spills.*[11] They

---

**10.** Dr. David Cohen is a board certified dermatologist, who has researched and lectured on, *inter alia,* contact dermatitis, toxic responses of the skin, and the role of allergens in contact dermatitis. Although this court does not have a copy of Dr. Ronald Harbison's resume, he is a coauthor of "Assessment of the Human Risks to PCBs Associated with the Expected Environmental Exposures," reprinted from Advances in Ex-

posure, Health and Environmental Effects Studies of PCBs Symposium Proceedings, Office of Toxic Substances, Health and Environmental Review Division, U.S. Environmental Protection Agency. (Exh. BBB.)

**11.** The HASP recites regulatory standards and sets forth precautionary measures to be taken by personnel to avoid coming into contact with

were designed to limit exposure to PCBs as much as possible, and they do recite deleterious health effects that can result from acute or chronic toxicity, including dermal exposure to PCBs. However, the only exposure limits provided are for *airborne* PCBs or for PCB liquids, i.e. liquids containing over 50 ppm PCBs. Plaintiffs have offered no measures of PCB concentrations in the air above their property.[12]

Regardless of the deleterious health effects they recite, these ConEd documents cannot be accepted in lieu of statistically sound, scientific, medical studies linking exposure to toxins to particular illnesses in living creatures. Numerous authorities have cautioned that "generalizations made in personal injury litigation from regulatory positions" are "particularly problematic." *Reference Manual,* p. 205 (problematic due to great variability in the amount of evidence needed to support different regulations). As Judge Weinstein explained in the *Agent Orange* case:

> The distinction between avoidance of risk through regulation and compensation for injuries after the fact is a fundamental one. In the former, risk assessments may lead to control of a toxic substance even though the probability of harm to any individual is small and the studies necessary to assess the risk are incomplete; society as a whole is willing to pay the price as a matter of

policy. In the latter, a far higher probability (greater than 50%) is required since the law believes it unfair to require an individual to pay for another's tragedy unless it is shown that it is more likely than not that he caused it.

\* \* \* \* \* \*

> Regardless of what regulatory action would be justified by current evidence .... such evidence would not be sufficient to find an individual defendant liable to an individual plaintiff.

*In re Agent Orange Product Liability Litigation,* 597 F.Supp. 740, 781 (E.D.N.Y.1984), *aff'd in relevant part,* 818 F.2d 145 (2d Cir. 1987); *see also Allen,* 102 F.3d 194, 196 & 198 ("the fact that EtO has been classified as a carcinogen by agencies responsible for public health regulations is not probative of the question whether Allen's brain cancer was caused by EtO exposure.")

Thus, such recommended or prescribed precautionary standards cannot provide legal causation here. Failure to meet regulatory standards is simply not sufficient to establish general causation. Moreover, these documents do not even mention most of the ailments that plaintiffs say they suffer. Further, they do not address prolonged exposure to low doses of PCBs in the *soil* and *water.* Even if these documents were proof of gen-

PCBs on the site (such as wearing safety shoes, a hard hat, latex gloves, etc.). (*See, e.g.,* "Health and Safety Plan," Table 1 and p. E–12, *attached to* Pl. 4/24/97 Ltr. "Item # 20".) It was prepared in accordance with the requirements of the OSHA Hazardous Waste Operations and Emergency Response—Final Rule published 6 March 19.89, and used as a basis a NIOSH/OSHA/USCG/EPA report. (*Id,* at CE 000428; *see* Aff. of Thomas Pease, Partner of the Hazardous Waste and Geology Group at Lawler, Matusky & Skelly ¶ 2, Exh. L.) The Order on Consent sets forth acceptable cleanup levels in order for ConEd to comply with NYSDEC regulations. (Pl. 4/23/97 Ltr. "Item # 36".) The remaining two documents, as their names imply, address cleanup of PCB fluid *spills.* PCB fluids contain over 50 ppm of PCBs. (See e.g., "Safety Services Instruction Memorandum—PCB's and Fluids which Contain Trace PCB's," "Comprehensive Emergency Response Plan For Hazardous Materials Incidents," *attached to* Pl. 4/24/97 Ltr. "Item" # 's 33–36.)

Plaintiffs unwarranted reliance on the HASP as an authority on the toxic effects of PCBs could

actually have damaging implications for their personal injury claims. The HASP lists PCBs in blood as the only "medical monitoring procedure" for "evidence of personnel exposure." (*See* "Appendix C: Health and Safety Plan." Pl. 4/24/97 Ltr., "Item # 20".) As discussed below, plaintiffs' blood tests reveal low to average levels of PCBs. Not surprisingly, plaintiffs do not advocate following this portion of the HASP, however, but instead argue that such tests should not be considered reliable or probative.

12. Even if we could accept these recitations as admissions, the only effects of PCB exposure they "admit" in plaintiff's own words, are "irrit(ation to) eyes, ch(l)oracne, liver damage," "irritation to ... skin, acne, form derm(atitis), dark urine, jaun(dice)," "nausea, vomiting, weight loss, ..., edema, pain," and "cancer." (Pl.Comb. Stmt.¶¶ 21–24, 33, 35.) This list by no means encompasses all of plaintiffs' complaints. For example, ailments such as baldness, "sensitization syndrome," learning disability and bronchospasm are not mentioned and thus could not have been "admitted."

eral causation, (which they are not), they certainly do not establish that these plaintiffs' ailments were caused by their exposure to PCBs (specific causation). Thus, a differential diagnosis would still be required.

Plaintiffs' final attempt at distinguishing some of the cases relied upon by defendants is to argue that several of them, such as *Cavallo*, 892 F.Supp. 756, *Viterbo v. Dow Chemical*, 646 F.Supp. 1420 (E.D.Tx.), *aff'd*, 826 F.2d 420 (5th Cir.1987), and *Wade–Greaux*, 874 F.Supp. 1441, concern the "legal insufficiency of proof of proximate cause," which is not an issue in this case. (Pl.Br. p. 11). That argument is clearly wrong. All three cases address the admissibility of expert scientific testimony on causation. None of them discusses the legal tests of "proximate cause." [13]

Plaintiffs proffer the testimony of Dr. Schwartz in an attempt to establish causation. This court, after *Daubert*, is obligated to scrutinize Dr. Schwartz's qualifications, his methodology, and the literature on which he relies to determine whether he is legally qualified to testify on this issue. Thus, cases discussing the admissibility of expert testimony on the issue of causation are exactly on point. We therefore must proceed to evaluate Dr. Schwartz's testimony according to the *Daubert* criteria.

Dr. Schwartz's own testimony reveals that he did not even attempt to follow the methodology prescribed by *Daubert* and its progeny. His testimony reveals that he made no serious effort to perform the first step of the methodology by evaluating the dosage of the toxin plaintiffs have received. *See Chikovsky*, 832 F.Supp. at 345. Relying solely on the Mancusos' assertions that they had been exposed to dangerous levels of PCBs and that another of plaintiffs' experts, Dr. Webber, would so testify, Dr. Schwartz ordered no special tests of plaintiffs, and did not

examine the Echo Bay site or the data on PCB levels there before opining that PCBs were the cause of plaintiffs' complaints. (*See* Schwartz Aff. Exh. 2, March 31 report; Schwartz Trans. at 88, 114, 237.) [14] He testified that he had no idea of what the levels of contamination at Echo Bay were, other than that they were "elevated," (*id.* at 114), and explained that his "assumption was that if there does exist such information [PCB contamination of the soil], that would be the testimony given by whoever did the testing," (*id.*, at 88).

In addition, his testimony reveals that he had only a sketchy idea of the amount of time plaintiffs spent in the water or wetland areas. When asked how much time he believed the Mancusos spent in contact with water or soil, Dr. Schwartz could give only general answers. For example, when asked how much time he believed Mrs. Mancuso spent in the water, Dr. Schwartz testified as follows:

Q: And what was your understanding of her exposure?

A: My understanding of her exposure is that it was sufficient to cause biological effects.

Q: I'm asking, though, what was the number of exposures that you understood she had?

A: We did not discuss an actual number except in the general sense that part of the exposure would be helping Frank with regard to the boats outside the water. Also, she would be bathing in the water itself and bathing in the water from time to time, hanging the feet over the dock into the water. That type of exposure.

Q: *Well, what was your understanding at the time you formed your opinion as to how many times she had been in the water in any given year?*

A: *I did not have an opinion or an understanding about the number of times*

---

13. The only mentions of the word "proximate" in these cases are found in the title of several of the Westlaw headnotes and in a quote from an expert who states that the plaintiff's ailments are "a direct and proximate cause" of her exposure to Jet fuel. *Cavallo*, 892 F.Supp. at 770.

14. Only after writing the March 31st report, (subsequently rejected by Judge Fox), did Dr.

Schwartz then made his first site visit on June 6, 1995. (Schwartz Trans. at 166.) Dr. Schwartz later went back to the marina for a second visit, and, as discussed above, after doing approximately 14–15 hours of library research and review, (*id.* at 184–5), gave plaintiffs' attorney the supplemental report dated June 27, 1995.

*except it was sufficient, whatever it was, to have produced the biological manifestation.*

Q: So you didn't know whether she had been in the water once a year or 100 times a year?

A: That's correct.

Q: Did you know how often she had been in the mud?

A: No.

Q: Did you have any idea?

A: No.

(Schwartz Trans. at 122–123 (emphasis added).)

Even this vague understanding has been brought into serious doubt by the testimony of the Mancusos themselves. Ellen Mancuso testified that she worked full-time at Macy's up until Theresa's birth, and helped out part-time at the marina assisting people that came in, answering the phone and tying up boats. (E. Mancuso Trans. at 7–8, Exh. Q.) Such testimony does not suggest frequent contact with the water or mud. The Mancusos have testified at length about the "disgusting" smell and contamination of the Marina in a case they have brought against the New York State Thruway Authority seeking damages for drainage onto their property from a storm drain. (*Id.* at p. 27.) According to the Mancusos and other witnesses, the drain disgorges sewage, oil and various other types of garbage, such as hypodermic needles, crack viles, sanitary napkins, condoms, highway litter, etc. (F. Mancuso Aff. (Thruway Case), Exh. C; F. Mancuso Trans. (Thruway Case) at 143, 151, Exh. D; F. Mancuso Trans. (Thruway Case) at 53–55, Exh. E.) In a 1990 letter to Congresswoman Nina Lowey requesting that the channel be dredged, Frank Mancuso complained that "the odor after a storm can make you dizzy" and stated that "I wouldn't let my kids swim there." (Ltr. p. 2, Exh. F.) He testified that a customer complained that the marina looked like a "cesspool." (F. Mancuso Trans. (Thruway Case) at 119.) Mrs. Mancuso's brother, Brian Ehlers, testified that from 1989 to 1992 he worked at the marina five days a week, from 9 to 5 and that he "never went in the water ... because everyday it's a different color." (Ehlers Trans. at 8, Exh. V.) Ehlers stated

that customers complained that the water was "dirty and it stunk." (*Id.* at 11.) He added that "[n]obody ever swam there" and stated that his niece and nephew [sic] "absolutely" never swam there because Mrs. Mancuso "wouldn't let them go in the water." (*Id.*)

ConEd points to numerous other instances in the record that call into question the description the Mancusos gave Dr. Schwartz of their exposure. We do not consider it necessary to address each and every such instance here, because we believe that it is already clear that Dr. Schwartz did not make a sufficient effort to determine the levels of PCBs to which plaintiffs were exposed. His failure to read the laboratory tests, to visit the site, or to elicit detailed descriptions of their exposure is unacceptable. Had he seen first-hand the filthy condition of the water before rendering his opinion, he might have been more skeptical of the plaintiffs' general accounts of the time they spent in the water and mud and at least sought more detailed descriptions from them of their exposure.

 As courts have recognized, it is improper for an expert to presume that the plaintiff "must have somehow been exposed to a high enough dose to exceed the threshold [necessary to cause the illness], thereby justifying his initial diagnosis. This is circular reasoning." See (*O'Conner*, 807 F.Supp. at 1396; *Cavallo*, 892 F.Supp. at 764, n. 12); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir.1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *Perry v. U.S.*, 755 F.2d 888, 891, (11th Cir.1985); *Viterbo*, 646 F.Supp. at 1424–25 (doctor formed preconceived theory when he initially diagnosed plaintiff as suffering from toxic exposure relying only upon plaintiff's oral history, without testing him first.) However, this appears to be exactly what Dr. Schwartz did. Dr. Schwartz's own testimony reveals that he simply assumed that plaintiffs had been subjected to an exposure high enough to cause their ailments. When asked how often he believed Ellen Mancuso had immersed herself in the water, Dr. Schwartz testified that: "I could not

answer that one way or the other except that it must have been a significant exposure to have developed these biological manifestations in her as well as the others." (Schwartz Trans. at 197.) Defendant's attorney then asked "Well, doctor is your conclusion that they were exposed to PCBs based on physical evidence in the Mancusos?" "Yes," Dr. Schwartz replied. (*Id.*)

The fact that plaintiffs designated Dr. Schwartz as their medical expert witness before he had even examined them [15] further suggests that Dr. Schwartz's "diagnosis" that PCBs caused plaintiffs' illness was a conclusion drawn and communicated to the plaintiffs' attorney prior to examination. He conducted only a 3–hour physical examination and review of the medical records of all four plaintiffs before writing, later that day, his initial March 31st report concluding that plaintiffs' ailments were caused by exposure to PCBs. (Schwartz Trans. at 83.) He relied on the opinions of no other experts in reaching his decision, although in his report he did suggest that the learning impairment he observed in Theresa required a "formal educational psychological assessment." (March 31st Rept. at 2, Schwartz Reply Aff. Exh. 2.)

Perhaps most damning, however, is Dr. Schwartz's failure to conduct a differential diagnosis. Once again, Dr. Schwartz admitted this failure in his own testimony. For example, he testified:

Q: Did you do anything to exclude other substances as the cause of any of the conditions?

A: *No.*

Q: Why not?

A: I saw symptoms and syndromes which were fully accountable by PCB exposure and felt that based upon the information as given to me and subsequently which I read, the diagnosis is PCB exposure.

Q: Because PCB's [sic] can cause those conditions?

A: And in this particular case objective data showed that there were higher levels in the soil.

15. Schwartz was designated on March 27, 1995, the physical exam took place on March 31st.

(*Id.* at 238.) This failure to exclude other possible causes is particularly disturbing in light of the common nature of many of the plaintiffs' complaints. Dr. Schwartz himself admitted that skin rashes and contact dermatitis can have a myriad of causes. (Schwartz Trans. at 236.) While for the purposes of this motion, we need not and do not determine whether the illnesses complained of by the Mancusos were in fact caused by exposure to PCBs, we do believe that where the data Dr. Schwartz evaluated to make his decision suggested to doctors more experienced in the relevant area than he is that much in the plaintiffs' treatment histories was inconsistent with a diagnosis of PCB poisoning, and that these histories were more consistent with a diagnosis of other much more commonplace ailments, Dr. Schwartz should have considered whether other causes were at work.

For example, Dr. Cohen concluded that Mr. Mancuso suffered not from PCB exposure, but from male-pattern baldness and folliculitis, the irritation of hair follicles due to bacteria. (Exh. AA.), and plaintiffs' prior medical records reveal that in September of 1993, plaintiffs' dermatologist, Dr. Tobi Klar diagnosed Ellen's, Theresa's and Deanna's skin eruptions as consistent with excematous dermatitis, "contact origin". (9/23/93 Ltr. from Klar to Tartaglia, Exh. Z.) When Dr. Klar billed plaintiffs, she checked a box labeled "Dermatitis, Allergic/ Contact 692.0" (Pl. Medical Records at 01462, Exh Z.) The 1996 International Classification of Diseases identifies "692.0" as "Contact dermatitis and other eczema: Due to Detergents". (Reply Exh. Q.) We recognize that Dr. Klar's billing designation may have been a choice made from a limited number of broad categories on a standardized form. However, if Dr. Schwartz for some reason had not already concluded that plaintiffs should be tested for allergies to determine if their symptoms were merely allergic reactions to other substances in their environment, Dr. Klar's billing code certainly should have suggested to him that such testing would be advisable.

(Reply Aff. Exh. D; Exh. LL.)

The testimony of PCB expert Dr. Arnold Schecter further condemns Dr. Schwartz's "diagnosis" of the plaintiffs. Dr. Schecter is the author of *Dioxins and Health,* one of the books provided to Dr. Schwartz by plaintiffs' attorney, *see* fn.5, *supra,* and the editor of the treatise *Toxicology.* He was brought into this case at the behest of plaintiffs, they claim as a non-treating physician. However, they later dropped him. (ConEd argues plaintiffs did so because Dr. Schecter's testimony would not support their claims as to the cause of their symptoms.) (Reply Aff. Exh. D.) ConEd deposed Dr. Schecter in 1994. He testified that the skin rashes "could well be" caused by PCBs, but that they "can be from any causes." (Schecter Trans. at 110.) Although Dr. Schecter stated that he did not believe that plaintiffs had asked him to give an opinion on whether PCBs caused their illnesses, (*id.* at 126), he testified at length about the appropriate techniques he would use for determining whether their particular illnesses were caused by PCB exposure.

According to Dr. Schecter, in order to determine whether PCBs have caused a particular injury: "You would again go back to the basics of occupational medical history or environmental history. You would take a history of what chemicals were present, what the levels were, how the exposure would occur, and then when the symptoms started and then when the symptoms ended." (*Id.* at 113). Dr. Schecter added that he would determine if there were "other likely causes of the rash" such as poison ivy contact. (*Id.* at 126.) In an article he had written nine years previously, he recommended "A thorough occupational medical history and physical examination is stressed for any worker or other patient who may have been exposed. Appropriate laboratory tests, including complete blood count with differential, serum chemistries, serial blood PCB determinations, fat biopsy to estimate furan and dioxin levels, if indicated, pulmonary function tests, chest x-rays, urinalysis including porphyrin measurement.... " (*Id.* at 69–70.) This testimony, elicited from a witness originally consulted by plaintiffs, confirms the importance of following the same toxicological methodology prescribed by the courts and employed by ConEd for evaluating the Mancusos' claims in this case. Dr. Schecter recommended that environmental and exposure levels be determined, blood tests be given and other causes be ruled out. This is exactly the methodology that plaintiffs argue is unnecessary.

Pursuant to his recommended methodology, Dr. Schecter referred plaintiffs to an expert, Dr. Mary Wolff, to have their blood tested for PCBs. (*Id.* at 41.) In July of 1994, Dr. Wolff determined that plaintiffs' blood PCB levels were respectively 3.8, 3.4, 1.9 and 3.7 parts per billion (ppb). (Exh. FF.) Dr. Schecter testified that the typical blood level of PCBs for adults in New York is 4–10 ppb, and that his own level was 10–11 ppb. (*Id.* at 38.) He attributed his higher number to his diet (for example, fish tend to have relatively high levels of PCBs), and to age, explaining that PCBs accumulate in the blood with age. (*Id.*) Plaintiffs argue that these tests were taken too long after their exposure ended to be useful; Dr. Schecter himself testified that it would be difficult in 1994 to determine accurately what the plaintiffs' blood levels were at the time they were living at the marina. (*Id.* at 49, 106 ("the blood measurements are not useful with lower, medium low exposures or long times after exposures").) However, a blood test conducted in October of 1992 detected no PCBs in plaintiffs' blood, with a detection level of 5 ppb. (Exh. CC.) Plaintiffs state that they lived at the marina from 1989 to 1992. Thus, within no more than a few months after they left the marina, the level of PCBs in their blood was less than 5 ppb, below the average of persons in the New York area. (*See* Comb. Stmt. ¶ 112.) Unfortunately, when faced with negative blood results, neither doctor ordered a fat biopsy, although Dr. Schecter testified that fat tissue is "sometimes preferred because PCBs are lipid or fat soluble and so a larger amount would be present in fact than would be the case in blood." (Reply Exh. I at 42.) Even if we accept plaintiffs' argument that blood tests must be done immediately in order to be useful, the fact that their blood PCB levels were so low a few months after they left the marina should have alerted Dr. Schwartz to consider alternate causes for plaintiffs' ailments.

Thus, in summary, we reject plaintiffs' argument that the WHO methodology should not apply here. Though they repeatedly urge that this methodology is inapplicable where it is "generally accepted" in the scientific community that PCBs cause the types of conditions and syndromes they allegedly suffer from, this argument completely ignores the most fundamental tenet of toxicology—*toxins cause illnesses only at sufficient dosages.* Nor are we at all satisfied upon the record before us that a review of the literature would show that every one of the particular physical ailments the Mancusos have exhibited is generally considered to be caused by PCBs. Therefore, we conclude that Dr. Schwartz's testimony is unreliable not only because he does not have the requisite knowledge or experience in PCB toxicology, but also because he failed to follow conventional toxicological methodology in making his determination that PCBs caused plaintiffs' ailments. He did not make sufficient determinations of environmental PCB levels, nor of the extent of the plaintiffs' exposure thereto. Lacking this necessary information, he was unable, and did not even attempt, to determine a dose-response relationship. Lastly, he failed to perform a differential analysis, making no attempt to eliminate other possible explanations for plaintiffs' ailments. Thus, we exclude his proffered testimony as to the cause of plaintiffs' illnesses.

### III. *Dr. Dietrich*

ConEd next challenges Dr. Jeanne Dietrich's opinion that Theresa Mancuso suffers from a learning disability.[16] Although it has not challenged the education or experience of Dr. Dietrich, a clinical psychologist, it does challenge her methods and conclusions. It argues that (1) Dr. Dietrich's testimony is not scientifically reliable under *Daubert* because it does not rely upon the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV); (2) that in fact, under the DSM–IV and according to the New Rochelle Committee on Special Education ("CSE"), Theresa does not have a learning disability; (3) there is no evidence that establishes general causation (that PCBs cause learning disabilities); (4) there is no evidence on specific causation since Dr. Schwartz's testimony should be inadmissible. Plaintiffs counter that the DSM–IV method is not the only accepted method for diagnosing learning disability, that Theresa in fact is learning disabled, that there is literature suggesting PCBs cause learning disabilities, and that Dr. Dietrich's testimony should therefore be admissible. We address these arguments below.

Dr. Dietrich examined Theresa three times in May and June of 1995. During the course of her examinations, she administered several standard intelligence and performance tests to Theresa, including the Wechsler Pre–School and Primary Scale of Intelligence, Revised ("WPPSI–R"), and the Kaufman Assessment Battery for children. She determined that while Theresa's overall intelligence was in the average range, she had "significant attention and memory weaknesses" and "unevenness in cognitive abilities" that would present "stumbling blocks to learning in a traditional manner." (Dietrich Report of 6/28/95, Exh. VV.) While Dr. Dietrich did not provide percentiles for Theresa's Weschler scores, Theresa scored below 50th percentile in 10 of the 15 subtests in the Kaufman Assessment.[17] (*Id.*, p. 3). Theresa also scored 50% or below in seven of the eleven WPPSI–R subtests that ConEd's own

---

16. Dr. Dietrich also diagnoses Theresa as suffering from attention deficit disorder. ConEd has not challenged this diagnosis.

17. These scores were:

| Subtest | Percentile | Subtest | Percentile |
|---|---|---|---|
| Simultaneous Processing | 39 | Spatial Memory | 29 |
| Achievement | 37 | Sequential Processing | 27 |
| Triangles | 37 | Hand Movements | 16 |
| Reading/Decoding | 34 | Word Order | 16 |
| Mental Processing Arithmetic | 13 | Composite | 32 |

expert, Dr. Gordon, administered to her.[18] (Exh. UU at 8.) Dr. Dietrich concluded that Theresa is suffering from "attention deficit disorder and learning disability (mixed type affecting both language and the perceptual domain)". (*Id.* at 9.) Dr. Gordon disagrees, arguing that under the DSM–IV criteria, Theresa does not have a learning disability, because none of her scores are two standard deviations below her overall intelligence score.[19] (Rule 26(a)(2)(B) Rept. of Dr. Gordon, Exh. UU at 5; DSM–IV, p. 46.)

In support of their argument that Dr. Dietrich's failure to employ the DSM–IV method for determining a specific Learning Disorder should preclude her testimony, ConEd cites numerous cases lauding the reliability of the DSM series. While these cases certainly praise the DSM, none of them involved a *learning disability*, and none excluded an expert from testifying under *Daubert* for failure to adhere to the DSM. In fact, many were criminal cases, and many of the relevant quotes came from concurring or dissenting opinions. *See, e.g., U.S. v. Harris,* No. S192 Cr. 455, 1994 WL 683429 at *4 (S.D.N.Y. Dec. 6, 1994) (court considering criminal defense of "pathological gambling" noted that the New York Times characterizes the DSM as the "psychiatric profession's

diagnostic bible"); *U.S. v. DiDomenico,* 985 F.2d 1159, 1167 (2d Cir.1993) (dissent in criminal case).[20] Dr. Gordon also testifies that the DSM is the "standard manual used to make diagnoses by psychologists." (Exh. UU at 5.) Dr. Dietrich opines that even-if her diagnosis does not fit that for a specific Learning Disorder under the DSM–IV, it is consistent with a diagnosis of "Learning Disorder Not Otherwise Specified." The DSM–IV states that:

> This category is for disorders that do not meet criteria for any specific Learning Disorder ... This category might include problems in all three areas (reading, mathematics, written expression) that together significantly interfere with academic achievement ... though performance on test measuring each individual skill is not substantially below that expected.

(DSM-IV, p. 53). ConEd naturally vigorously disputes the accuracy of this assessment, arguing that Theresa's report cards show she does not suffer from "significant interference with academic achievement." (*See* discussion, *infra* ).

Dr. Dietrich counters that she does not need to follow the DSM methodology because although the DSM is widely respected in the

---

**18.** These scores were:

| Subtest | Percentile | Subtest | Percentile |
|---|---|---|---|
| Information | 50 | Animal Pegs | 37 |
| Comprehension | 50 | Arithmetic | 16 |
| Vocabulary | 37 | Geometric Design | 2 |
| Similarities | 37 | | |

**19.** This Court was unable to independently apply the DSM–IV test to Theresa's scores, due to lack of a clear enough explanation by Drs. Gordon and Dietrich as to which tests and which numbers are relevant to such an analysis. Regardless, we accept Dr. Gordon's assertion that Dr. Dietrich did not follow the DSM–IV methodology for determining a specific Learning Disorder as true, since plaintiffs themselves do not contest this point.

**20.** Defendant cites in a footnote: *U.S. v. Kozminski,* 821 F.2d 1186, 1202 (6th Cir.1987), (concurring opinion in criminal case), *aff'd,* 484 U.S. 894, 108 S.Ct. 225, 98 L.Ed.2d 185 (1987); *Burns v. Clusen,* 798 F.2d 931, 938 (7th Cir.1986) (criminal habeas); *Rowland v. Mad River Local School Dist.,* 730 F.2d 444, 454 (6th Cir.1984) (dissenting opinion in § 1983 case), *cert. denied,* 470 U.S. 1009, 105 S.Ct. 1373, 84 L.Ed.2d 392

(1985); *U.S. v. Libutti,* Crim No. 92–611, 1994 WL 774647 *11 & n. 11 (D.N.J. Dec.23, 1994) (experts agree criminal defendant manifests criteria for pathological gambling under DSM "authoritative classification system"), *aff'd without opinion,* 72 F.3d 124 (1995), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1996); *Nelsen v. Research Corp. of Haw.,* 805 F.Supp. 837, 843 (D.Haw.1992) (evidence in bench trial did not prove that plaintiff suffered from Post Traumatic Stress Syndrome as defined by DSM); *Rush v. Johnson,* 565 F.Supp. 856, 863 n. 25 (N.D.Ga.1983) (court defining "transsexualism" in suit for Medicaid reimbursement of transsexual operation asserts that "DSM is the standard manual for diagnosis used by psychiatrists").

field of psychological disorders, it is not the "bible" for determining learning disability. (Dietrich Report of 12/1/96, Exh. 16.) She asserts that she has properly made a "clinical" diagnosis and that learning disability "means difficulty in learning despite adequate intelligence." (Dietrich Report of 11/19/95 at 2, Exh. WW.) She states that the U.S. Department of Education has provided guidelines as part of Public Law 94–142 that indicate that a learning disability is present when:

> the child does not achieve commensurate with his or her age and ability in one or more of the following areas: oral expression, listening comprehension, basic reading skills, reading comprehension, mathematics calculation or mathematics reasoning.

(Jerome M. Sattler, *Assessment of Children's Intelligence and Special Abilities*, (2d Ed.1988), pp. 399–400, (citing Federal Register, December 29, 1977, p. 6503, 121a.541), *attached to* Pl. 5/19/97 Ltr.)[21] The current embodiment of the 1977 regulation is apparently 34 C.F.R. § 300.7, which reads as follows:

> (10) "Specific learning disability" means a disorder in one or more of the basic psychological processes involved in understanding or in using language spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The term does not apply to children who have learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

DOE "Children with Disabilities", 34 C.F.R. § 300.7(a)(10). Dr. Dietrich asserts that Sattler is considered the "definitive text" for diagnosing learning disabilities in children, and that while Sattler gives several proposals for establishing the presence of a learning disability, he emphasizes that "*[i]n the final analysis, clinical and psychoeducational considerations must come together in a diagnosis of learning disability.*" (Sattler 2d Ed. at 400.) Dr. Dietrich contends that her diagnosis is such a "clinical psychoeducational" diagnosis.

In response, ConEd asserts that Dr. Dietrich did not follow any of Sattler's proposed methodologies for determining a learning disability. It notes that in his Third Edition, Sattler explained that a specific learning disability under Public Law 94–142 "should be applied only to children who have a severe discrepancy between achievement and intellectual ability in one or more expressive or receptive skills, such as written expression, listening and reading comprehension, or mathematics." (Sattler, (3d ed) at 598), and that Dr. Dietrich herself stated in her original report on Theresa, that Theresa had "no significant discrepancy between verbal and performance IQ ...," (Def. 6/19/97 Ltr at 2, (citing Exh. VV, p. 4)). Dr. Gordon adds that the implication of Dr. Dietrich's use of "scores in the 34th percentile[22] (Theresa's score) would mean that at least 1/3 of individuals would be labeled 'Learning Disabled.'" (Gordon Rept. of 1/15/97, Reply Exh. M.)

ConEd also argues that an analysis consistent with Public Law 94–142 was made by the New Rochelle Committee on Special Education ("CSE"), not by Dr. Dietrich. (*See* CSE Rept., Exh. 17.) It points out that 34 C.F.R. § 300.540 requires such an assessment be made by "a multi-disciplinary evaluation team" including the a teacher, (preferably the child's regular teacher

---

**21.** Public law 94–142, passed in 1977, apparently amended portions of the Education of All Handicapped Children Act of 1975, and is now codified at 20 U.S.C. §§ 1400–1406, 1411–1420. The purpose of the Act, in general, is to assure that "all children with disabilities have available to them free appropriate public education and related services to meet their needs," to insure their and their parents' rights and to assist states and localities in providing such education. DOE

Regulations, "General Purposes" 34 C.F.R. § 300.1 (1992).

**22.** Although it is difficult to tell exactly what score Dr. Gordon is referring to, Theresa did score in the 34th percentile in the Reading Decoding portion of the Kaufman Assessment given by Dr. Dietrich. (*See* fn.17, *supra*.)

where possible), and "at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher," and thus Dr. Dietrich could not properly apply the regulations by herself. A member of the CSE that evaluated Theresa, Yvette Goorevitch, Director of Special Education in New Rochelle, testified that: "The Committee accepted the clinical judgment of Dr. Dietrich but did not reach the same conclusion on page nine with regard to the existence of a learning disability as used by federal and state law with regard to an educational disability." (Goorevitch Trans. at 56, Exh. TT.) Thus, it appears that under a proper application of 94–142, Theresa is not disabled.[23] However, the CSE report did replicate Dr. Dietrich's findings of attention deficit disorder and learning disability. (CSE Rept. at 2, Exh. 17.)

ConEd next points to Theresa's average to good report cards as proof that, as a matter of law, she does not have a compensable learning disability. In her Kindergarten Report Card, Theresa received 33 "Satisfactory" marks (the highest mark possible), 10 "Improving," and two "Not at this time." Her teacher's comments were: "Theresa is a pleasure to have in class! We are very pleased with her social development thus far!" (Exh. RR.) In her latest report card, she received 6 A's, an A-, 4 B+'s, 3 B's, a B in Academics, and 7 "Satisfactory" and 2 "good" marks in Character Development. Her teacher commented that she is "showing good growth in all basic skills areas. She needs much encouragement before taking part in classroom discussions, but we are working on that." (ConEd 5/22/97 Ltr., Exh C.)

 Although ConEd's arguments against Dr. Dietrich's conclusion that Theresa is learning disabled are quite powerful, we are not persuaded that Dr. Dietrich's testimony should be excluded. We are not convinced that Dr. Dietrich must follow the

DSM–IV methodology for diagnosing a specific Learning Disorder in order to testify. ConEd has cited no cases in which a qualified psychologist was excluded from testifying because she did not follow the DSM–IV. Nor do we believe we can conclude that Dr. Dietrich's diagnosis does not fit under the category of "Learning Disorder Not Otherwise Specified." Dr. Dietrich is a well qualified psychologist who gave Theresa established intelligence and performance tests. ConEd can impugn Dr. Dietrich's testimony at trial by presenting to the jury Theresa's report cards and the evidence that Theresa does not have a learning disability under either the DSM–IV criteria or the federal and state guidelines as applied by the New Rochelle School District's CSE. Indeed, this latter argument packs considerable force, because it appears that these are the same guidelines that Dr. Dietrich relies upon to support her opinion. Although Dr. Dietrich's opinion appears to rest, in the end, on essentially her "clinical psychoeducational" judgment, we believe that in an area of science as grey as learning disabilities, ConEd's counter-evidence properly goes to the weight, not to the admissibility of Dr. Dietrich's testimony. *See Boucher,* 73 F.3d at 21. Certainly Dr. Dietrich should be allowed to testify to the results of the tests she gave Theresa, her observations on Theresa's behavior, and her diagnosis of attention deficit disorder, and we do not believe it would be error to allow Dr. Dietrich to testify further that, based upon these results and observations in her "clinical" opinion, Theresa has a learning disability. We believe a jury is adequately equipped to evaluate that opinion and the other relevant evidence and determine whether this child, in fact, suffers from such a disorder.

There is a caveat, however. Dr. Dietrich will not be allowed to testify that PCBs caused the ailments she diagnoses in Theresa. Dr. Dietrich is not a medical doctor, much less an expert on the effects of exposure to PCBs. We decline at this point to

---

**23.** Although the Mancusos' also attempt to rely on New Rochelle's decision to place Theresa in an "inclusion" class as evidence that New Rochelle in fact considered her to have some type of learning disability, we accord no weight to this

argument. As Dr. Goorevitch herself explained, these classes have 5–6 disabled children and 21–22 children who are "regular kids." (Goorevitch Trans. at 17), and thus inclusion as a "regular kid" is no evidence that a child is disabled.

reach the question of whether the literature shows that PCBs can cause learning disabilities, since we have excluded the testimony of plaintiffs' proffered expert on causation. If plaintiffs cannot produce a qualified expert to testify that PCBs cause learning disabilities, Dr. Dietrich's testimony will be excluded as irrelevant.[24]

III. *Summary Judgment*

▬ Although we have held that Dr. Schwartz is not qualified to testify, and without his opinion plaintiffs have submitted no evidence that PCBs were the cause of their complaints, we decline to grant summary judgment at this point. We have explicitly not determined whether the PCB levels on the Mancusos' property could be a danger to human health and whether, in fact, some or all of plaintiffs' ailments were caused by exposure to PCBs. While defendant has made a compelling argument that the PCB levels at Echo Bay were not harmful and that many, it not all, of the illnesses alleged by plaintiffs are not caused by PCB exposure, we are unprepared to hold as a matter of law that these contentions are correct. We will allow plaintiffs a brief period to find a qualified expert and submit an adequate Rule 26(a)(2)(B) report. However, our patience is not unlimited. In October of 1994, Magistrate Judge Fox warned plaintiffs that they had 20 days to provide expert reports "sufficient in accordance with the rule" and that "if they're not sufficient, you're facing preclusion. They're entitled to know what they're facing and you're getting very close to trial in this case." (Exh. JJ.). The trial is even closer now. Unless plaintiffs submit within 45 days an expert's report complying with rule 26(a)(2)(B), or show good cause why they need additional time to do so, their complaint will be dismissed with prejudice.

Plaintiffs are cautioned that this report must be rendered by an expert who has knowledge and experience in the medical effects of PCB exposure and who follows accepted toxicological methods. If the Mancusos wish to avoid yet another, and final, exclusion by this Court, the report must discuss the literature that supports the expert's conclusions and include copies of the relevant portions of such literature.

SO ORDERED:

---

24. We note, without deciding at this point, that the recently submitted report of Dr. Bruce Roseman likely cannot provide such causation testimony. (See Pl. 6/11/97 Ltr.) This report appears to suffer from many of same deficiencies as Dr. Schwartz's reports. To mention only a few, Dr. Roseman does not discuss, nor even cite, a single scientific article in support of his opinion. He does not opine that PCBs caused Theresa's "neurological impairment" but merely recites in an unacceptably cursory manner that he has "ruled out to [his] satisfaction all reasonable causes for her neurological impairments with the exception of environmental toxins" which he is "still investigating." He apparently did not examine Theresa herself, but relied heavily upon Dr. Dietrich's conclusions of attention deficit disorder, and reports that Theresa often answers questions with "one or two word answers," that she has a "sad quality about her," and has "poor handwriting"!